## THE UNION PACIFIC RAILROAD COMPANY *v.* THE UNITED STATES OF AMERICA.

COMMON CARRIER'S LIEN.—The property of the Government is not exempt from a common carrier's lien for freight.   There is no exception to the general rule in favor of the United States or any other government or sovereignty;  the exemption would incalculably cripple the public service, the liability would equally promote it;  no consideration of justice or policy favors, every consideration of justice and policy forbids the exemption;  the liability enlarges, the exemption narrows sovereign action;  the liability, not the exemption, is a privilege, and therefore an attribute of sovereignty.

JURISDICTION.—When the United States voluntarily comes into court invoking the action of the law in its behalf, it submits itself to the jurisdiction of the court and stands thereafter upon the same footing; and its rights must be determined by the same principles as if it were a private suitor.

UNDERTAKING IN REPLEVIN.—In replevin, at the common law, a judgment could only be for a return of the property, but by the statutes of this territory, an undertaking is given as a substitute for the property, and is to be charged with the judgment.

COSTS.—At common law, when the government is a party, an adverse judgment would not embrace costs; but when the government institutes the suit and furnishes the requisite security, electing to provide a fund for the costs, and to accept an adverse judgment charging that fund, the costs will be embraced in the judgment.

ERROR to the District Court of Carbon County.

This was an action of replevin instituted in the district court, of the second judicial district of the Territory of Wyoming, within and for the county of Carbon, by the United States of America, then plaintiff, to recover from the

Union Pacific Railroad Company, then defendant, a lot of Indian supplies which had been transported by the defendant as a common carrier, and upon which the defendant claimed a right of lien for its services. The action was commenced by filing a petition on behalf of the plaintiff, in the words and figures following, to wit:

TERRITORY OF WYOMING, } ss.
    COUNTY OF CARBON. }

*In the District Court of the Second Judicial District.*

The United States of America, Plaintiff,
*v.*
The Union Pacific Railroad Company, Defendant.

### PETITION.

The United States of America, plaintiff, complains of the Union Pacific Railroad Company, a corporation organized and acting under the laws of the United States of America, defendant, for that the said plaintiffs are owners of the following described goods and chattels, to wit: — 3 cases, 6 bales of dry goods, 4 cases of shirts, 3 cases, 3 packages of hardware, 1 case of hats, 669 awls in cases, 1 case of tin cups, 4 cases of hatchets, 505 handkerchiefs, 1 case coats, 1 case ax handles, 9 boxes camp kettles, 9 bales, 2 cases blankets, 2 cases clothing, 2 cases hats, 3 packages drugs, and is entitled to the immediate possession of the same, and that the said defendant wrongfully and unjustly retains in his possession the said goods and chattels and from the said plaintiff. And said plaintiffs further aver that defendant did so wrongfully detain the possession of said goods and chattels for the space of sixty days next before the commencement of this suit, and wholly deprive the said plaintiff of all use and benefit thereof during all said time, to the damage of said plaintiffs in the sum of five hundred dollars. Wherefore plaintiffs pray an order against the said defendant, that he may be ordered to deliver to said plaintiff the said goods and chattels, and also a judgment against the said defendant for the said sum of five

hundred dollars, their damages sustained by reason of the unlawful detention thereof.

EDWARD P. JOHNSON,
*Attorney for Plaintiffs.*

And thereafter the defendant filed its answer in the same cause, which was in the words and figures following to-wit:

TERRITORY OF WYOMING, } *ss.*
  COUNTY OF CARBON.    }

*In the District Court of the Second Judicial District.*

The United States of America, Plaintiff, }
              v.                          }
The Union Pacific Railroad Company, Defendant. }

ANSWER.

Now comes the said defendant, the Union Pacific Railroad Company, and for answer to the petition of the said the United States of America, says:

*First*—That it denies each and every of the allegations stated and contained in the said petition, except that the said defendant is a corporation as therein alleged.

And of this the said defendant, puts itself upon the country.

*Second*—And the said defendant, for a further answer to the petition of said plaintiff, says:

That it is a common carrier of goods and merchandise, for hire and reward, from the city of Omaha, in the state of Nebraska, to the town of Rawlins, in the territory of Wyoming, that as such common carrier it received the said goods and chattels in the plaintiffs' petition mentioned, long prior to the commencement of the action herein, at Omaha, aforesaid, from one Dwight J. McCann, who was then lawfully in the possession and control of the said goods and chattels, for transportation to Rawlins, in the territory

of Wyoming, and that thereafter as a common carrier, the said defendant carried and transported the said goods and chattels from said Omaha to said Rawlins, that under and by virtue of the contract under which the said goods and merchandise were carried and transported, the said defendant was to have the right to retain the possession of the said goods, chattels and merchandise, and of each and every part thereof, until its charges for the carriage, transportation and storage of the same should be fully paid and discharged.

And the defendant says: That its charges for the carriage, transportation and storage of said goods, wares and merchandise, nor any part thereof, has ever been paid, that its charges as aforesaid on the 20th day of November, A. D. 1877, amounted to the sum of five hundred and eighty-eight dollars and sixteen cents, to-wit: For freight and transportation, four hundred and ninety-six dollars and eighty-six cents, and ninety-one dollars and thirty cents, for storage, and the said defendant, further says: That on the 20th day of November, A. D. 1877, under and by virtue of the contract aforesaid, and under its lien as a common carrier, it had a special ownership in the said property, goods, wares and merchandise, in the plaintiffs' petition mentioned, and in each and every part thereof, and on said day was entitled to the possession of the said property, and of each and every part thereof.

Wherefore the said defendant says: That the said plaintiff wrongfully and unlawfully deprived the said defendant of the possession of the property in the plaintiff's petition mentioned, to the damage of the said defendant, in the sum of five hundred and eighty-eight dollars and sixteen cents.

And the said defendant prays judgment against said plaintiff, for the said sum of five hundred and eighty-eight dollars and sixteen cents, with interest thereon since the 20th day of November, A. D. 1877, and costs of this action.

W. R. STEELE,
*Attorney for Defendant.*

And thereafter the cause was submitted to the court below, upon an agreed statement of facts, which was in the words and figures following, to-wit:

Territory of Wyoming, ⎱ *ss.*
   County of Carbon, ⎰

*In the District Court of the Second Judicial District.*

The United States of America, Plaintiff, ⎱
         *v.*                                                                     ⎰
The Union Pacific Railroad Company, Defendant. ⎰

STIPULATION AND AGREED STATEMENT OF FACTS.

It is hereby stipulated and agreed by and between the said The United States of America, plaintiff, by E. P. Johnson, its attorney, and the Union Pacific Railroad Company, defendant, by W. R. Steele, its attorney, that the facts in this case, are as follows:

The goods replevined in this action are the property of the United States, furnished for the Indian service.

That one Dwight J. McCann had a contract with the United States, for the transportation of the goods replevined and of other goods, from the city of New York, and other points, to the White River Indian Agency, in Colorado, that as such contractor the possession of said goods was delivered to said Dwight J. McCann, who was lawfully in possession of the same, being the goods replevined.

That said Dwight J. McCann, made a contract with the defendant, The Union Pacific Railroad Company, to transport and carry the goods replevined in this action and other goods, from Omaha, in the state of Nebraska, to Rawlins, in the Territory of Wyoming.

That the defendant carried the goods replevined, as a common carrier, from said Omaha, to said Rawlins, for which its proper charges was the sum of five hundred and ninety-six dollars and eighty-six cents.

That the goods replevined were stored in the warehouse

of the defendant, at Rawlins, Wyoming, for a long period of time, for which the proper charges of the defendant for storage, was the sum of ninety-one dollars and thirty cents.

That on the 20th day of November, A. D. 1877, the proper charges of the defendant, for the transportation and storage of the goods replevined in this action, was the sum of five hundred and eighty-eight dollars and sixteen cents.

That no part of said charges have ever been paid, either by the said Dwight J. McCann, or the plaintiff, the United States of America, and no tender of the sum so due, or any part thereof, was ever made to the defendant, before the commencement of the action herein, and the taking of the said goods from the possession of the defendant on replevin.

That the goods of the plaintiff previously carried by the defendant, under said contract with said McCann, had always been held by it until its charges thereupon had been paid by said McCann.

That the appraised value of the property taken on replevin in this action, is the sum of four thousand nine hundred and fifty-one dollars.

That the defendant claimed the right of lien as a common carrier, upon the goods replevined, and the right to hold the possession of the same, until its charges for the transportation and storage of said goods replevined should be paid.

That the United States refused to pay defendant its said charges or any part thereof.

It is agreed, that had the goods replevined been the property of said Dwight J. McCann, the defendant would have had a lien thereon for its said charges for freight and storage, and a right to hold possession of said goods until its said charges were paid.

The question submitted to the court is:

The property replevined being the property of the United States, is and was the defendant entitled to a lien upon said property, for its charges, and had it a right to hold possession of the same until its charges were paid?

If the court shall find upon the facts, that the defendant had and was entitled to a lien, and was entitled to the possession of the goods, at the time they were replevined, and that the court has authority to render judgment herein against the plaintiff, then judgment should be in favor of defendant, and against the plaintiff, and sureties, for the said sum of five hundred and eighty-eight dollars and sixteen cents, and interest.

Should the court upon the facts, find that the defendant was not entitled to such lien, and could not hold possession of said property replevined until its charges were paid, then judgment should be in favor of the plaintiff, and against the defendant.

The parties expressly waive their right to trial by jury, and agree to try this cause to the court.

E. P. JOHNSON,
*Attorney for Plaintiff.*

The Union Pacific Railroad Company,
By W. R. STEELE,
*Its Attorney.*

RAWLINS, WYOMING,
    September, 9th, 1878.

And thereafter the court below, filed its findings and opinion, which was in the words and figures following, to wit:

| The United States of America, *v.* The Union Pacific Railroad Company. | In the Second Judicial District. |
|---|---|

The trial of this cause has been submitted by the parties to the action, to the court, upon agreed statement of facts.

The question presented and upon which the decision of the court is invoked is, whether the property replevined being the property of the United States, is and was the

defendant entitled to a lien upon said property, for its charges, and a right to hold possession of the same until its charges were paid. Should the court decide this question in the affirmative, then the court is asked to decide the question whether it has the authority to render judgment herein against the plaintiff. This being an action of replevin, two things must be shown to entitle the plaintiff to recover:

*First*—That it was the owner of the goods in question or had a special ownership therein, and that it was entitled to the immediate possession of the property at the time the goods were replevined.

*Second*—That the property was wrongfully detained by the defendant.

Inasmuch as it is agreed that the property in controversy was the property of the United States, that question I will regard as settled. It is also admitted that the plaintiff did not undertake itself through its agents, to transport its goods to the White River Agency, in Colorado, but entered into a contract with a stranger, one D. J. McCann, to deliver said goods at the place above mentioned; this is all that is disclosed as to the provisions of said contract, except that McCann was lawfully put into possession of said goods for the purpose aforesaid.

Before proceeding to discuss the point of law involved in the case, I wish to say, that it would seem from the form of the question propounded to the court, in the agreed statement of facts, that the parties to the action desired to submit to the court, the abstract question, whether in any case a common carrier can have a lien on the goods of the United States.

Had the words, now under the foregoing statement of facts, immediately preceded the question propounded to the court, no such inference as suggested above could have legitimately been drawn or inferred. However, in considering the point submitted to the court, I have taken the most reasonable view of the matter, as to the intention of the

parties, and have regarded the question, not as an abstract one, but to be decided and determined in any view of the agreed statement of facts.

The counsel for the plaintiff rests his case solely on the proposition, that the ordinary lien of a common carrier does not attach to goods the property of the United States, and therefore, inasmuch as the property replevined in this case was the property of the United States, no lien of the defendant attached or could attach, whereby the defendant as a common carrier could legally withhold the possession of the same from the plaintiff, until all charges for transportation and storage were paid.

This proposition of counsel rests upon another, namely, that exception as to the operation of liens, has always been made in regard to the goods of all governments and sovereignties, for the reason that it constitutes a known prerogative of governments and sovereignties, that if such exception did not exist, the operations of the government or sovereignty might, and probably would often be subjected to the wishes and caprices of common carriers. If this last proposition be true, it necessarily carries with it the former, and the law must be declared to be with the plaintiff, for it will be observed that the proposition contended for by counsel is broader and goes much further, than the one submitted to the court under the agreed statement of facts. If, however, it is untenable and unsound, the plaintiff's case is as worthless as a rope of sand, and consequently the law is with the defendant.

I had supposed until this case arose, that the question here involved had long been settled by repeated decisions in the highest courts of the country, and I confess my great surprise, when I learned from counsel who argued the case, that such was not the fact. It would seem as if an inscrutable Providence had so ordered it, that this question should remain an open one, in order that some country lawyer promoted to the bench, residing in some wild western territory, with little more to aid him in his herculean

task than a volume of the Compiled Laws of the Territory of Wyoming, should be able to cut the gordian knot, and thereby gain immortal fame, by finding a happy and satisfactory solution of this most difficult of all questions.

Pardon this seeming digression. I will return to the consideration of the question involved in the case, viz: Is it true, that it is an acknowledged prerogative of all governments and sovereignties, to be exempt from the lien of a common carrier, or in other words, that no lien exists or can exist upon its goods for services rendered for transporting the same. In the case of the *United States* v. *James Wilder,* reported in Third Sumner, Massachusetts Reports, Justice Story argues this question with his usual ability, at considerable length, but declines to express a decided opinion thereon. But at the same time it is difficult to read his able opinion and to avoid the conclusion that he believed that no such exemption could be claimed, as a prerogative of any government or sovereignty whatsoever. Hear him. " The question," he says, " is whether a like lien exists in regard to goods belonging to the United States. No case has been cited in which any exception has ever been made in regard to the United States, nor has any authority been produced to show that it constitutes a known prerogative of any government or sovereignty. I have examined," continues the learned judge, " the treatises upon the prerogative of the Crown of England, and I do not find it there, or in any of the great abridgments of the law, under the title prerogative, any such exception recognized or even alluded to," and in another place the learned judge adds, " that the very reasons that the advocates of this doctrine advance to sustain their position, are the very ones that would drive me to the opposite conclusions."

I confess while reading the whole of what the learned judge said on this important question, in discussing another bearing to some extent on the one we are now considering, I felt like saying to him as Agrippa said to Paul, " Thou reasonest well."

Assuming that the seeming position taken by Justice Story on this question, be correct, from what power or authority let me ask, does the exception flow? Certainly not from the constitution of the United States, for it is silent on the subject, not from the action of congress, for it has passed no law in reference thereto, nor from the organic act of the territory, for the power creating liens has not been withheld from the legislature by congress, in that instrument. The conclusions would therefore seem inevitable that there is no express law relieving the goods of the United States from the ordinary lien of a common carrier. No one, I take it, will deny, that there are times in the history of every government or sovereignty, by reason of intestine strife, rebellion or war, when all laws but that of necessity. are virtually suspended, when the rights of individuals must yield to the public welfare, when even the constitution itself becomes as a piece of rubber in the hands of man, forced to expand and contract as the emergency of the hour may require. But no such state of things existed at the time the goods in controversy were replevined. Peace, with all that word implies, reigned supreme throughout the land; the Indian sat in his forest home with his cup of happiness full to overflow save the growling of an empty stomach, which this great and beneficent government of ours, had pledged its faith to him should never occur. In considering this question therefore, we have a right to take judicial notice, that the latter and not the former state of things existed.

With these observations as to the general doctrine of the prerogative of governments and sovereignties, I will without further delay consider the case at bar, as presented under the agreed statement of facts.

As I have heretofore stated, the goods in question were the property of the United States; this is admitted. It is also. admitted, that the United States made a contract with D. J. McCann, to deliver the goods at the White River Indian Agency, in Colorado, and for this purpose put McCann in

lawful possession of the same.    McCann brought the goods as far as Omaha, in the state of Nebraska, at which point he employed the U. P. R. R. Co. to transport them to the picturesque and world-renowned city of Rawlins, in the county of Carbon, Wyoming Territory.    McCann, forgetting or neglecting to pay the charges of the Company, for transporting and storing the goods, the Company held possession of the same, claiming the lien of a common carrier, to the extent of its charges.    At this juncture or crisis of affairs the United States, through its then able attorney, replevined said goods, hence this suit.    Now while it is true that the plaintiff's right to the immediate possession of said goods is involved in this case, yet under the agreed statement of facts, that question is finally disposed of, when the question as to the defendant's supposed lien is determined.

Independent of the agreed statement of facts, it might be contended, I take it, that the United States, having parted with its goods until they should be delivered or arrive at the Indian Agency in Colorado, could not claim that it was entitled to the immediate possession of them while in transit. But that question, and the further question, whether the defendant in an action of replevin, in order to defeat the plaintiff, can be permitted to show that a third party and not the plaintiff has the right to the immediate possession of the goods in controversy, I am not called upon for the reason aforesaid, to decide.

Returning again to the only question to be considered, I would say, that I have only been able to find one case bearing directly upon the point in issue; that is the case of *Dufolt* v. *Gorman,* reported in the first volume Minnesota Reports.    The opinion of the court was delivered by Justice Sherburne.

This was an action brought by the plaintiff to recover a sum of money, which he alleged to be due him for hauling a quantity of goods, the property of the United States, from a place called Watah, in the territory of Minnesota, to St. Paul.    It is not clear by any means that

the question of lien was properly before the court or necessary for the court to decide, but the court thought it was, and decided that the plaintiff acquired no lien upon the goods to the amount of his services in transporting them. The learned judge who delivered the opinion of the court, cites no authority to support his decision on the question of lien, and had he given less reasons for his decision, he would have remained silent. He contented himself by saying, that individuals obtain no lien upon property of the government as security for their services, such a power might often subject the operations of the government to the wishes and caprice of common carriers, and dismisses that branch of the subject by adding, that it needs no argument to prove that he is correct. I am frank to admit, that this is a very convenient if not ingenious way to dispose of a troublesome question, when reasons for the ruling are almost entirely absent, and authority cannot be found to support it. Apply the iron rule laid down in this case, to all cases for the transportation of government goods, and the result is, that the rights of individuals are no more nor no less in time of peace than in war. Individual rights which should be sacredly observed and protected by the government in all cases except in the contingency I have heretofore referred to, are to be regarded as of no moment, and that too by a government professing to be a government of justice, created by the people and for the people. The bare annunciation of such a doctrine is sufficient, were it possible, to cause that section found within the lids of the Compiled Laws of this territory, and which the courts are admonished to keep constantly in view, known as substantial justice, to bid adieu to the people of this territory, and take the wings of the morning.

In order that we may see more clearly the injustice that must necessarily result from a universal application of the rule laid down in the case last referred to, let us take the case at bar. In this case the government does not attempt through its own agents to transport its goods, but contracts

with a stranger to do so, one who can make no claim to honesty, but whose only ambition would seem to be, to find a resting-place within the walls of a penitentiary. Yet the government puts its goods in the possession of this man, thereby endorsing him as a man of character and of honor, his contract is his letter of credit, and with it he is enabled to secure the confidence of its citizens. Armed thus he goes forth on his mission. He makes contracts for the transportation of government's goods, and when his victims have rendered the service they agreed to perform, he neglects or refuses to pay their reasonable charges. What is the next step in this great act of injustice, if not fraud? The government is forced to dismiss its worthless contractor, and endeavors to repossess itself of its goods. The railroad company says to the government, pay us our reasonable charges and we will deliver your goods to you, your contractor having neglected and refused so to do. The government admits the service rendered and that the charges are reasonable, but declines to pay. What next? The government which has received the benefit of the services rendered, appears before a tribunal where justice is at least supposed to be administered, and asks it to become a party to a fraud, by declaring in effect that it is a known prerogative of all governments and sovereignties, to be excused for failing to be honest. I confess my sense of justice and of right revolts at such conclusions. But notwithstanding that such is the case, I feel that it is not only my duty, but that I am, at least to some extent, bound to respect and follow the decision rendered in the case of *Dufolt* v. *Gorman*, before referred to; with this conviction, but with a mental reservation, I must and do declare, that the law on the proposition submitted, is with the plaintiff.

And thereupon the court rendered judgment in the said cause, in favor of the plaintiff, and against the defendant. The defendant below having filed its motion to vacate the findings and judgment, and to grant the defendant a new trial, in the said cause, and the same having been denied,

prosecuted its writ of error, to reverse the judgment of the court below.

*W. R. Steele*, for plaintiff in error.

*E. P. Johnson*, for defendant in error.

PECK, J. This is a suit of replevin, brought by the Federal government against the company, for merchandise, as property owned by the former, and to the immediate possession of which it was entitled. The defendant plead the general denial; also that it held possession under a carrier's lien, when the merchandise was taken from it upon the writ of replevin. The facts were argued upon, submitting to the district court their legal effect, so that the issue was in form one of fact, in substance one of law. Its judgment was based upon this agreement: The parties stipulated that the case might be heard at chambers, and the judgment rendered as of the previous September term of 1878: and the judge who sat in the case below proceeded in form according to the stipulation. Whatever doubt might exist as to the power of parties to confer upon a district judge jurisdiction to try and decide an issue of fact in vacation, and render judgment of an expired term, is met by the fact that in this instance he was trying an issue of law—for which purpose, under the statute of December 15th, 1877, for facilitating the business of the district courts, the court was open and the September term unexpired, when the case was heard and decided; and the circumstance of rendering the decision as of a prior day during the term, is unimportant.

One Dwight J. McCann had a contract with the government, to whom the merchandise belonged, for the transportation of it from New York, or other point or points east of Omaha, to the White River Indian Agency in Colorado, where it was to be used in the Indian service; the defendant's road from Omaha to Rawlins was a proper route of

transportation for the purpose of getting the property to its destination; he contracted with the company to transport from Omaha to Rawlins accordingly; and under the contract delivered the property to the company at Omaha, and the latter duly carried it to Rawlins, and there stored it ready for delivery; and for the carrying and storage was legally entitled to be paid $588.16, no part of which sum had been paid or tendered to it, when the writ of replevin was executed. As against McCann, had the property been his, the company would have had the usual common carrier's lien upon it for these charges. The government, claiming that its property was exempt from such a lien, refused to recognize the company's demand, and replevied the goods, the value of which, as per the replevin appraisal, was $4,951. The transportation from Omaha to Rawlins, and the contract for it, were necessary acts on the part of McCann in the performance of his contract with the government; and nothing appears to indicate that, when the writ was executed, and up to that time, he was not in the due discharge of the latter contract; and it must be taken, if that can affect the questions to be decided, that he was then and until then in the proper discharge of his duty to the government.

In considering the questions presented by the record, we will first assume that government property is exempt from the common carriers' lien. The government can retain or waive the exemption at will. Had it transported the merchandise through an agent, the property would have remained under its control, the possession of the agent would have been its possession, the contract of carriage would have been directly between it and the carrier; and thus the exemption would have attached, and been retained. It transported the merchandise through a contractor; the contract measured the relations of the parties, and subjected them to reciprocal obligations, precisely as it would have done, had both been private individuals; imposing upon him the duty to transport, it incidentally con-

ferred upon him the right to adopt such methods, and to make such sub-contracts of carriage, as should be necessary to perform that duty—therefore to make such sub-contracts according to the established rules of carriage. The primary contract was an irrevocable authority from the government to him to that end, and to that extent—an authority upon which he, and all parties dealing with him within its scope, might rely. Receiving possession from the government, he received it upon the faith of his contract with it; contracting with the railway company, and re-delivering the property to it, the sub-contract was made, and by the company performed, upon the faith of the primary contract; all the incidents of common carriage, among them the usual lien for charges, attaching thus, the government waived its exemption, is subject to the lien, and is powerless to disturb the rights which have arisen between McCann and the company. Can anything be more incongruous than that the government should hold its contractor to his obligation, and have the right to frustrate the very methods which are indispensable to the performance of that obligation? Governments, as individuals, are held to the duty of good faith, and good faith forbids.

But the exemption does not exist. The exemption would incalculably cripple the public service, the liability would equally promote it; no consideration of justice or policy favors, every consideration of justice and policy forbids the exemption; the liability enlarges, the exemption narrows sovereign action; the liability, not the exemption, is a privilege, and therefore an attribute of sovereignty. The learned counsel for the defense in error, has submitted to us no adjudication to the contrary, which we should follow as a guide, or respect as advisory; and we are convinced that such an adjudication does not exist. On the other hand, all the analogies of the commercial and maritime law, and the Federal decisions under that law, are directly the other way. In 9 Wheat., 409, *St. Jago de Cuba*, it was decided in 1824 that seamen and material men, who served

and supplied the ship after her seizure as a slaver, had respectively liens upon her against the United States for wages and supplies, and that she stood pledged to them accordingly.

The case of the *United States* against *Wilder*, reported in 3 Sumner at page 308, is in point. The government shipped supplies for the public service by the schooner Jasper, from Boston to New York, under the terms of the common bill-of-lading, by which the goods were delivered on payment of freight; the vessel went ashore on Block Island upon her passage; expense was, consequently incurred in saving the cargo, constituting a case of general average in favor of the owners and master of the Jasper, who struck an average of the expense among the freighters, the government included, and refused to deliver the clothing to the latter, on its refusal to provide for its share of the average; the latter conceded that the average was correct, and that it was liable for its proportion claimed of it, but denied that its property could be retained for payment,—that is, denied that the vessel had a lien against the government for contribution. The suit was brought, and the claim thus presented to the United States circuit court for decision; and the claim of lien was sustained, the judges concurring.

In rendering the decision Judge Story said : " *The present case is not one arising under contract, but by operation of law, and, if I may so say,* in invitum. *It is a case of general average, where, as in a case of salvage, the right of the party arises from sacrifices made for the common benefit, or labor and services performed for the common safety. Under such circumstances the General Maritime Law enforces a contribution independent of any notion of contract, upon the ground of justice and equity, according to the maxim,* qui sentet commodum sentire debet et onus, *and it gives a lien in* rem *for the contribution.*" If this is accurate reasoning, it equally applies here; the present case may in like manner be said to arise, not by contract, but by operation of law; the freight money to be an incident to the office of the

carrier, who is a public servant, compelled to carry and to insure; and the Commercial Law, which creates the office, and defines its incidents of duty and right to enforce the payment of the freight money by a lien *in rem.*

But with unfeigned respect for that judge, we dissent from his reasoning as unsound; not as frustrating the principle on which he based the decision, but as weakening its application. The rights to general average, and to its accompanying lien exist at the Maritime Law; are abstract and dormant in the absence of a contract of shipment; by a contract of shipment become active and attach, and, in case of a loss, creating a general average, though the contract is utterly silent about them, they enure to the carrier, —and manifestly it can be only by contract. So the right to the freight money and to its accompanying lien exist at the Commercial Law; are abstract and dormant in the absence of a contract for carriage; by such contract are invoked and attach, though the contract is utterly silent respecting them; and are manifestly contract rights. But, whether the lien attaches under a principle of law, unaided by contract, or under a contract, into the substance and construction of which it enters, it is still a lien, binding the sovereign; and it none the less binds the sovereign, if imposed by contract. Thus the *United States* v. *Wilder*, furnishes a threefold sanction to the idea that the Federal government is subject to the carrier's lien. The case responds to the voice of justice and sound policy; it accords with the analogy of the law, and it has the *imprimatur* of two judges; as to one of whom, Mr. Justice Davis, of the district court, it may be said, that it would be difficult to find a more reliable member of the American Judiciary; and as to the other of whom, Mr. Justice Story, it may be said, that for conception, for exposition, for administration of the Commercial Law, of which Bailments are a part, he was the most accomplished jurist and judge in our language. This case was decided in 1838, and was relied upon as authority, and fully adopted by the supreme court

of the United States in the case of *The Siren,* 7 Wallace, 152, and *The Davis,* 10 Wallace, 15, decided respectively in 1868 and 1869, in one of which cases it was adjudged that the government was subject to the lien of a maritime tort, and in the other to the lien for salvage, the same as a private individual is. The books show that every description of maritime lien, whether arising by contract, tort or otherwise, other than the carrier's lien, affects the government and citizens alike; that these liens exist from the necessities of commerce, and the necessities of commerce are the necessities of the public service; it is not simply difficult to perceive, it is rationally impossible to perceive why the same rule should not apply to the carrier's lien. In the course of his opinion in 3 Sumn., Judge Story said: "That in all cases of contract made by the United States, exemption from the ordinary lien attached thereto by the maritime law, is more than I know, or am prepared to admit. Take the case of a shipment of goods, like the present, on board of a coasting vessel for transportation from one port to another, under the terms of a common bill-of-lading, by which the goods are deliverable to the consignee, or his assignees, he or they paying freight. I must say that I am not prepared to declare that the ordinary lien for freight does not attach in such a case, upon the very footing of the terms of the contract, as it would upon a shipment by a private person." The point which was the subject of this remark, was not before the judge for decision, and was not decided; but the opinion, as an opinion, is strong authority because of its author, and is directly in point, for that case, and the present one, are precisely alike in the matter of a freight lien; the fact that in that case the bill of lading required the freight to be paid before delivery, and the fact that in this one there is no evidence that the condition was expressly reserved by the company, constituting an immaterial difference, inasmuch as the reservation is only what the law implies in its absence. In disposing of this subject, we consider that the entire transaction

from the making of the original contract to the reception of the property took place in a state of peace. Whether a state of war would constitute an exception, is a matter which we are not required to, and do not determine.

The counsel for the government claims that the district court could render a judgment for, but not against it; we have listened with attention and respect to his argument, advanced in favor of this proposition; and candor requires us to admit that he has presented it as well as it could be presented; but candor also compels us to say that the proposition is throughout and throughout a fallacy. To what consequence does the proposition lead? The United States may invoke the jurisdiction of the court; it may accept that which does, and discard that which does not accord with its supposed interests; it may dictate the exercise of the administration of the law; it is not bound by the rules of equal justice; it is a privileged suitor; the district court having rendered a judgment against it, this court must reverse; having rendered one for it, this court can only affirm; it can sit in appeal, must mechanically obey, cannot revise; nay, further,—having brought the suit, and effected a caption, its aim is accomplished; it needs no judgment, for but one judgment can be rendered in the case, and that in its favor; if having made the caption, it neglects to prosecute the writ; a motion to dismiss for want of prosecution will be unavailing; still further, the demand in the writ for judgment is meaningless, the undertaking of the sureties without force, the writ is superfluous; and the suit is farcical, because it is intended to effectuate under the forms of law what can as well be accomplished by the violent hand under an irresponsible will. Does not the proposition result in a pure *reductio ad absurdum?* The Federal government cannot at common law be drawn into court. This is a sovereign prerogative, intended to protect it not only from rapacious litigation, but from just judgments as well, because the latter could be employed to disturb its due

control of its property.   On the same ground suit cannot
be instituted against the property of the government, if the
bringing or institution of the suit requires the issuance of
process against the government, or the disturbance of its
possession of its property.   The exemption is personal, and
the will to retain is a will to waive it, in the exercise
of sovereign interests.   When it does waive the privi-
lege invoking the jurisdiction of the court, it submits
to that jurisdiction; presenting a claim for its adjudica-
tion, it asks that the claim be adjudicated upon its
merits—and allowed or rejected acordingly.   But the
waiver is held to be limited, so as to guard the gov-
ernment against personal judgments.   Within this limita-
tion of the waiver, judgments may be obtained against
it.   If it sues, it is subject to the defense of offset up to the
amount of whatever claim it shall establish,—a defense
which does not controvert the claim, but is in the nature
of a limited or quasi cross-suit against it; allowed, not to
the extent of affirmative remedy beyond, but only to
the extent of defeating that claim.   7 Pet., 1., *United
States* v. *McDaniels;* 7 Pet., 18, *United States* v. *Ripley;*
9 Pet., 319, *United States* v. *Robeson.*   It is true that
this right of offset is created by statute; but it is also
true that the statute, in creating it, recognizes this
principle of waiver.   At common law, however, a suit by
the government, subjects its claim to any defense founded
upon a defect in the claim itself; such a defense inheres in
the suit, the power to sue confers the right of defense, and
invokes the full jurisdiction of the court to both sides for
the purpose of disposing of it according to its merits.   So
far this is the present case; the defense here made is founded
on defect in the plaintiff's claim.   But the case goes further.
It is a suit *in rem.*   The supreme court of the United States
applies this rule to all proceedings *in rem* instituted by the
Federal government, namely:   That the institution of the
proceeding is a waiver of its exemption from suit either
against itself or its property, and opens the subject matter

of the proceeding to all opposing demands, standing towards defendants and claimants precisely like a private suitor, except as to costs and affirmative relief beyond the thing in controversy; the theory of which rule is that the government asks for, and can obtain, only what belongs to it out of the property.   Upon this rule, that court disposed of the cases of *The St. Jago de Cuba, United States* v. *Wilder, The Siren,* and *Davis,* each of which was a proceeding *in rem* instituted by the United States, and in each of which an adversory lien was allowed; the case of the *United States* v. *Wilder* was commenced in trover but converted into a suit of detinue by a stipulation that, if the government was exempt from the lien in question, "*the defendant should be defaulted, and the clothing immediately given up;*" and in the case of *The Davis,* one Douglas libelled her cargo for salvage and the government intervened as owner, denying the claim, and becoming thus an actor in the controversy.   According to this rule, the present suit being a proceeding *in rem,* the right of the United States is subject to the lien of the Union Pacific Railroad Co.; were the suit regulated by the common law, the judgment would be for a return of the property—exact restoration; but it is regulated by the statute, which, at sections 175 and 180 of the Civil Code, provides for an undertaking with surety to the defendant in at least double the amount of the property, conditioned, that the plaintiff shall duly prosecute the action, and pay all costs and damages that shall be accorded against him; which undertaking need not be signed by the principal, but must be taken before the property is delivered to the plaintiff, and provides that, the property having been delivered to the plaintiff, when the jury shall find for the defendant, they shall also find whether he had the right of property, or only of its possession at the commencement of the suit, and finding either for him, shall assess his damages, including his attorney's fees, for which and costs of suit, judgment shall be rendered in his favor against the plaintiff and his sureties.   Thus the undertaking is a substitute for the property, and is to be charged with the judgment.

Under the distinction above explained, and by which the record would be construed, a judgment for the defendant, in suit of replevin, brought upon this statute, would, were the plaintiff a private person, be a general and personal judgment, also a judgment specifically against the undertaking; but, the plaintiff being the government, it would be a judgment only against the undertaking, and though we direct such a judgment to be in form entered, we do not mean to say that it would not suffice to limit it in form to one against the surety, for whatever its form, whether entered against the government and surety, or against the latter only, it would in effect be a judgment against the surety alone. At the common law the judgment would not embrace costs, but the government, by instituting the suit, and furnishing the requisite security, elected to provide a fund for the costs, and to accept an adverse judgment charging that fund with the costs; it is therefore consistent to embrace the costs in the judgment. In the territorial practice an attorney is what the common law intends by the two capacities of attorney and counsellor; the term attorney fees, in section 180, means the reasonable fees earned in the district court, in the performance of attorney and counsel services on the defense. At the common law such fees could not be embraced in a judgment for the defendant, but under the statute the plaintiff is chargeable with them, as a part of the damages, for the same reason that it is chargeable with the costs. Were we to send the case to the district court, we should direct it to embrace in its judgment the attorney fees, fixed at a reasonable amount upon the principle above stated.

The Company, however, waiving those fees, judgment is rendered for it for $588.16, and interest from November 20, 1877, as damages, and for the costs of the district court, and those of this court.

Judgment reversed.