(December 13, 1916.)

STATE, Plaintiff-Respondent, v. NATIONAL SURETY COMPANY, a Corporation, Defendant-Respondent; T. C. COFFIN, Intervenor-Appellant.

[161 Pac. 1026.]

ACTIONS AGAINST THE STATE — JURISDICTION — CONSTITUTIONAL AND STATUTORY CONSTRUCTION—ATTORNEY'S LIENS—APPROPRIATIONS— LIMITATIONS—CLAIMS AGAINST THE STATE—OFFICERS AUTHORIZED TO CREATE—LIMITATION OF AUTHORITY.

1. The right to enforce an attorney's lien against the proceeds of a judgment in favor of the state in this jurisdiction depends upon constitutional and statutory provisions. This court will not be bound by, or follow, decisions of appellate courts of other jurisdictions in the enforcement of attorney's liens against the proceeds of a judgment in favor of the state and in the custody of the court, where such decisions are directly in conflict with the constitution and statutory provisions of this state.

2. Sec. 4900, Rev. Codes, as amended by Sess. Laws 1911, c. 167, p. 563, fails to provide for an attorney's lien in favor of an attorney who appears on behalf of the state, which attaches to a verdict, report, decision or judgment in favor of the state, or to the proceeds thereof. Said statute makes no reference to the sovereign power, and the sovereign is not included within the foregoing statutory provisions, either by express words or by necessary implication. As the government of the state is established for the good of the whole, and can only be supported by means of its revenues, courts in the construction of general laws will not ordinarily apply to the state such as upon their face seem to have been intended only to declare or regulate the rights and remedies of individuals and which, if so applied, would have the effect of obstructing the speedy collection of the public revenues.

3. *Held,* that no equitable lien attaches in favor of an attorney for services alleged to have been rendered the state that is enforceable against the proceeds of a judgment in the custody of the court, where the constitution and the provisions of the statutes in express terms provide the procedure that must be followed in order to authorize the payment of any claim against the state.

4. Sec. 18, art. 4, of the constitution, provides that "The Governor, Secretary of State, and Attorney General shall constitute a

Board of Examiners, with power to examine all claims against the State, except salaries and compensation of officers fixed by law," etc. This clause of the constitution is supplemented by the statutes, sec. 146, Rev. Codes, as amended by Sess. Laws 1913, c. 15, p. 58, as follows: "It shall be the duty of the State Board of Examiners to examine all claims against the State, except salaries and compensation of officers fixed by law." All claims of whatever character against the state must be submitted to the state board of examiners for their approval or rejection. To permit state officers to be harassed and hindered in the recovery of moneys embezzled by public officials, and to stop such moneys *in transitu* and charge the same with an attorney's lien for alleged services rendered the state in procuring said judgment, would be contrary to good public policy and detrimental to the due administration of the affairs of the state.

5. Any indebtedness created or attempted to be created against the state, by a state officer, whose duty it is under the law to represent the state in an action to recover moneys embezzled by a state officer, in excess of the appropriation made to such officer, is void.

6. *Held,* that there is a total absence of constitutional or statutory authority, authorizing the state depository board to create an indebtedness of the character sought to be recovered by appellant in this action, and all expenses authorized by law to be incurred by said board, in the performance of its official duty, must be audited and allowed as provided by law by the state board of examiners.

[As to lien of attorneys, see note in 51 Am. St. 251.]

APPEAL from the District Court of the Third Judicial District for Ada County. Hon. Charles P. McCarthy, Judge.

Action in intervention, to subject the proceeds of a judgment in favor of the state to an attorney's lien for services rendered and expenses incurred. Temporary restraining order issued and thereafter vacated. *Affirmed.*

Richards & Haga, V. P. Coffin and T. C. Coffin, for Appellant.

The equitable charging lien, which is the one involved in the case at bar, is entirely different from the common-law lien. It rests upon the broad principle that an attorney is entitled in equity to a lien for his fees and disbursements

upon the judgment which his services and skill have produced. This seems to be the only ground upon which it has ever been put. . (*Reed v. Dupper,* 6 Term Rep. 361, 101 Eng. Full Reprint, 595; *Baker v. St. Quentin,* 12 Mees. & W. 441; 152 Eng. Full Reprint, 1270.)

The authorities are collected and very ably reviewed in *Weed Sewing Mach. Co. v. Boutelle,* 56 Vt. 570, 48 Am. Rep. 821; *Warfield v. Campbell,* 38 Ala. 527, 82 Am. Dec. 724; *McDonald v. Napier,* 14 Ga. 89, 110; *Renick v. Ludington,* 16 W. Va. 378, 392; *In re Knapp,* 85 N. Y. 284; *Goodrich v. McDonald,* 112 N. Y. 157, 19 N. E. 649; *Barnes v. Taylor,* 30 N. J. Eq. 467.

The power which the courts have summarily to enforce the performance by the attorney of his duties toward his client enables the court to protect the rights of the attorney as against the client. (*Everett v. Alpha Portland Cement Co.,* 225 Fed. 931, 935, 141 C. C. A. 55; *Cowdrey v. Galveston etc. R. R. Co.,* 93 U. S. 352, 23 L. ed. 950; *Zentmire v. Brailey,* 89 Neb. 158, 130 N. W. 1047; *Merchants' Nat. Bank v. Armstrong,* 107 Ga. 479, 33 S. E. 473; *Walker v. Floyd,* 30 Ga. 237; *Fuller v. Clemmons,* 158 Ala. 340, 48 So. 101.)

If the fund on which the lien is claimed is paid into court, the court will not permit it to be withdrawn without first paying the attorney out of it. (*McKelvey's Appeal,* 108 Pa. St. 615; *Ex parte Plitt,* 2 Wall. Jr. 453, 19 Fed. Cas. No. 11,228, p. 883.)

In *Dahlstrom v. Featherstone,* 18 Ida. 179, 110 Pac. 243, this court recognized "the justness of the rule that an attorney may take such steps against his client as to have an equitable lien decreed by the court against the judgment to the extent of the balance due him for his services in procuring the judgment."

J. H. Peterson, Atty. Genl., A. A. Fraser and J. T. Pence, for Respondent.

If this is not a claim against the state, then it is no claim at all. (*Thomas etc. v. State,* 16 Ida. 81, 100 Pac. 761.)

Sec. 10, art. 5, and sec. 18, art. 4, of Ida. Const., must be construed together, and, as was said by this court in the case of *Bragaw v. Gooding,* 14 Ida. 288, 293, 94 Pac. 438: "The board of examiners were created by and derive their jurisdiction and authority from the same source as this court, and while acting within the scope of such authority, the courts have no power to direct or control their actions."

Under these two sections of the constitution as construed by this court, there is only one way by which a claim against the state can be prosecuted. It must first be presented to the board of examiners, and if by them disallowed, come before this court, secure a recommendatory judgment and with such judgment go before the legislature.

It is a general rule that statutes do not apply to the sovereign power without express words of reference. (*Thomas v. State, supra; Hendrick v. Posey,* 104 Ky. 8, 45 S. W. 525, 46 S. W. 702; *Wood v. State,* 125 Ind. 219, 25 N. E. 190; *United States v. Knight,* 39 U. S. (14 Pet.) 301, 307, 10 L. ed. 465, 469; *Compton v. State,* 38 Ark. 601.)

Appellant has his remedy clearly defined by the constitution. (*Rathbun v. State,* 15 Ida. 273, 97 Pac. 335.)

The equitable lien doctrine has no application in the face of the clear constitutional provision declaring how a claim against the state must be enforced. The district court has no jurisdiction to entertain it. (*Armstrong v. Mayer,* 60 Neb. 423, 83 N. W. 401; *Messner v. Giddings,* 65 Tex. 301; *Hollister v. State,* 9 Ida. 8, 13, 71 Pac. 541.)

"The state board of examiners is given power under section 18, article 4, of the constitution, to examine all claims against the state except salaries or compensations of officers fixed by law; and such power cannot be exercised by a district court." (*Thomas v. State, supra.*)

The sovereign, as well as an individual, can obtain the services of an attorney under such circumstances as will give to that attorney the right to assert a lien for his disbursements and fees against funds in the hands of the court obtained upon a judgment in favor of his client. (*The Siren,* 7 Wall. (74 U. S.) 152, 19 L. ed. 129; *In re Paschal,* 10 Wall.

(77 U. S.) 483, 19 L. ed. 992; *State v. Ampt*, 6 Ohio Dec. 699, 7 Am. Law. Rec. 469; *Board of Commrs. v. Clapp,* 83 Minn. 512, 86 N. W. 775; *Union Pacific R. Co. v. United States*, 2 Wyo. 170; *United States v. Boyd*, 79 Fed. 858; *Commonwealth v. Herr*, 1 Pears. (Pa.) 328.)

Where it is necessary to incur expenses to recover, preserve or protect a trust fund, the fund itself is directly chargeable with those expenses. (*Trustees of Impr. Fund v. Greenough*, 105 U. S. 527, 26 L. ed. 1157; *Colley v. Wolcott*, 187 Fed. 595, 109 C. C. A. 425; *State ex rel. Marshall v. Butler County*, 164 Mo. 214, 64 S. W. 176; *In re Creighton's Estate*, 93 Neb. 90, 139 N. W. 827.)

Hawley & Hawley, for Respondent, National Surety Company.

BUDGE, J.—One O. V. Allen was elected at the biennial election held on November 8, 1910, to the office of state treasurer of the state of Idaho for the years 1911 and 1912, and on November 5, 1912, Allen was re-elected to said office for the years 1913 and 1914. The National Surety Company of New York, to insure the faithful performance of all the duties of the office of state treasurer by Allen, furnished a bond to the state of Idaho in the penal sum of $200,000. During Allen's terms of office as such state treasurer he embezzled from the state of Idaho large sums of money that came into his hands. Suit was brought by the state of Idaho, as plaintiff, against the National Surety Company, a corporation, as defendant, in the district court of the third judicial district to recover the moneys so embezzled, which resulted in a judgment being entered in favor of the state of Idaho and against the National Surety Company in the sum of $145,264.34, and it was further ordered in said judgment that the state of Idaho do hold and retain, in addition to said sum of $145,-264.34, the payments made to the state depository board of the state of Idaho by and on behalf of the Bank of Nampa, namely, $7,414, together with costs and disbursements incurred in the action, amounting to the sum of $648.25.

The appellant herein appeared as one of the attorneys for the state in the trial of said cause in the district court. Shortly after the entry of the above-mentioned judgment, appellant, upon learning that the National Surety Company, through its attorneys, was about to pay to the state depository board the amount of the judgment recovered and thereby procure a satsfaction thereof, made and filed his application in the district court, wherein said judgment was rendered for permission to file a complaint in intervention, wherein he sought to subject a portion of said judgment to the payment of his attorney fees, alleged in his complaint in intervention to be due him for services rendered to the state in procuring said judgment, and for certain costs and expenditures made by him, alleged to have been incurred in connection with the preparation and trial of said cause. Permission was granted to appellant by the trial judge to file his complaint in intervention and his affidavit in support thereof; whereupon the trial court granted a temporary injunction wherein it was ordered that the National Surety Company, its attorneys, and each and all of them, were temporarily restrained from paying either to the state or its representatives the entire amount of said judgment, and directed that so much thereof as appellant claimed was due him for legal services rendered, to wit, $12,500, together with fees and expenditures alleged to have been incurred by appellant in connection with the preparation and trial of said cause, namely, $1,556.93, be retained by counsel for said National Surety Company until the further order of the court. The foregoing order was made on the 15th day of September, 1916. On the same date the state of Idaho, by its attorney general, J. H. Peterson, and A. A. Fraser, Esq., and J. T. Pence, Esq., moved, upon the minutes of the court, to dissolve the temporary restraining order theretofore issued. Said motion came on for hearing before the court, the state of Idaho being represented by the attorneys heretofore named; Messrs. Hawley and Hawley appearing as counsel for the National Surety Company; and Messrs. Richards and Haga and V. P. Coffin, Esq., and T. C. Coffin, Esq., appearing as counsel for intervenor. Said mo-

tion was argued by counsel for the respective parties and taken under advisement.

On September 19th, the appellant, by his attorneys, moved the court for permission to file an amended complaint in intervention; said motion being supported by his affidavit, which motion was granted by the court. Whereupon the amended complaint in intervention and affidavit were filed. On the same day the trial court entered an order "That the temporary restraining order theretofore issued should be vacated and the money should be permitted to be paid to the state depository board; that the court should order the state depository board to then deposit the amount of $14,056.93 in a special fund in the state treasury, to be designated as the State of Idaho v. National Surety Company fund, to be kept in such fund until the petitioner's claim is acted on in due course, or until further orders of the court . . . . that the balance of the proceeds of said judgment be paid to the state depository board and by them into the public treasury of the state of Idaho; that the plaintiff and defendant be not required to answer the petition of intervenor herein; that this court entertain no further jurisdiction in said case other than such as may be necessary to carry this order into effect." It was further provided in said order that, whereas it appeared to the court that the petitioner would perfect an immediate appeal from the order to the supreme court; that said order is an appealable order; that one ground of such appeal will be that the court should have ordered the sum of $14,056.93 of the proceeds of said judgment paid into that court, and should then have proceeded to try the issues between the petitioner and the state of Idaho as to whether the state should be compelled to pay petitioner for legal services rendered and expenses incurred out of the proceeds of the judgment in favor of the state, and if so, how much; and that "whereas the petitioner has applied to this court for a stay of the judgment entered herein, pending the determination of his appeal, so far as the same relates to the payment of said sum of $14,056.93 into the special fund in the state treasury; whereas it appears possible that in the event said sum is paid

into the state treasury, even though it be into a special fund, said appeal would be fruitless so far as the question just above mentioned is concerned, now, therefore, for the purpose of keeping said amount of $14,056.93 *in statu quo* until said appeal is perfected and the matter comes within the jurisdiction of the supreme court, it is hereby ordered that a stay of proceedings be and is hereby granted until 12 o'clock noon, Saturday, September 23, 1916, as to that portion of this order which requires $14,056.93 of the proceeds of said judgment to be paid to the state depository board and by said board to be paid into a special fund in the state treasury, and the operation of this order . . . . to that extent and to that extent only is suspended for that length of time.'' Said order further provided that appellant should immediately perfect his appeal to the supreme court and furnish an undertaking on such appeal. Whereupon counsel for intervenor duly perfected an appeal to this court from the order made and entered in the district court, on September 21, 1916.

After the appeal had been duly perfected, T. C. Coffin, Esq., intervenor below and appellant here, made an application for an order that the fund heretofore referred to be kept within the control and jurisdiction of this court until the appeal be determined. Thereupon this court, upon the filing of a good and sufficient bond, made an order to John W. Eagleson, as state treasurer of the state of Idaho, that he, as state treasurer, receive said amount of $14,056.93 from the defendant, and deposit and hold the same in a special fund, subject to the orders of this court.

This appeal is prosecuted from the order of the district court, dissolving the temporary restraining order heretofore referred to and refusing to take further jurisdiction of the proceedings in intervention instituted by the appellant. For a reversal of said order, the appellant assigns and relies upon the following assignments of error:

1. The court erred in that it ordered and adjudged that said temporary restraining order be vacated and dissolved. The court also erred in that it did not grant the prayer of the amended complaint in intervention, that said temporary

restraining order be continued in full force and effect pending the final judgment of the court herein.

2. The court erred in that it ordered and adjudged that the defendant pay the full amount of said judgment to the state depository board. The court also erred in that it did not grant the prayer of the amended complaint in intervention, that said defendant National Surety Company, a corporation, and its attorneys, Hawley and Hawley and James H. Hawley, Esq., their servants and agents, and each and all of them, be ordered to forthwith deposit with the clerk of said court said sum of $14,056.93, proceeds of said judgment, there to await the further orders of said court.

3. The court erred in that it ordered and adjudged that the plaintiff and defendant be not required to answer the petition of intervenor herein. The court also erred in that it did not grant the prayer of the amended complaint in intervention that all parties herein who have or claim to have interests or rights adverse to this intervenor be required to answer the amended complaint in intervention within ten days of the service upon them or their attorneys of the same.

4. The court erred in that it ordered and adjudged that said court entertain no further jurisdiction in said cause other than such as might be necessary to carry the order appealed from into effect.

The question presented to this court upon the record in this case is, in substance and effect: Conceding for the purposes of this case that there is no fund or appropriation in the state treasury out of which the attorney's fee and expenses necessarily incurred in obtaining the judgment heretofore mentioned, in favor of the state, can lawfully be paid, can the fund arising from the judgment itself be stopped *in transitu* by order of the court, and charged while in the custody of the law with the payment of the attorney fees and costs incurred in creating the fund, by asserting an attorney's lien against it?

As we view it, if, under the constitution and statutes of this state, an attorney's lien for services rendered the state may be asserted, against funds arising from a judgment pro-

cured in favor of the state, the trial court erred in dissolving the temporary injunction; in refusing to retain jurisdiction of the case; and refusing to require the state of Idaho and the National Surety Company to answer the amended complaint in intervention of the appellant herein. The various assignments of error heretofore stated, being all directed to the above propositions, may be considered collectively.

At the outset it may be conceded that if this were an action between individuals or private corporations, and notice were duly given to the judgment debtor as provided by law, the fund arising from the judgment would be subject to and chargeable with the attorney fee, and the same would be an enforceable lien against the proceeds of said judgment, together with costs and expenses incurred in obtaining the same. (*Kerns v. Washington Water Power Co.*, 24 Ida. 525, 135 Pac. 70.)

It will therefore be unnecessary for us to discuss that particular phase of this case, and we will confine ourselves to the question of the application of attorney's liens against the state or funds belonging to it. In doing so, we are not unmindful of the numerous cases that have been cited by able counsel in their brief and so earnestly argued upon presentation of this cause, for the purpose of establishing the right of an attorney to a lien upon the proceeds of a judgment in favor of his client for his fees and necessary and proper expenses, even where the client is the sovereign. There were a number of cases cited by counsel in their brief which would seem to bear out their theory, in the absence of constitutional provisions and statutory enactments directly in conflict with the doctrine announced therein. Upon examination we find some of these cases are not in point, for the reason that prior to the employment of the attorneys who represented the sovereign, necessary appropriations were made by the legislature to meet the expenses and attorney fees, in advance of the services rendered and expenses incurred. In other cases attorney's retaining liens have been upheld upon the theory that these liens existed from the necessities of commerce and the necessities of the public service. In our opinion the right

to enforce a lien of the character sought to be enforced in this case, if any exists, against the state in this jurisdiction, must depend upon constitutional and statutory authority, and we are not inclined to follow the decisions of appellate courts of other states where they directly conflict with the constitution and statutory provisions of our own commonwealth.

The common law as to the compensation of attorneys has been abrogated in this state by statute and is now a matter of contract, either express or implied. Sec. 4900, Rev. Codes, as amended by the Session Laws of 1911, c. 167, p. 563, is as follows: "The measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties, which is not restrained by law. From the commencement of an action, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action or counterclaim, which attaches to a verdict, report, decision or judgment in his client's favor and the proceeds thereof in whomsoever hands they may come; and cannot be affected by any settlement between the parties before or after judgment; but parties to actions or proceedings are entitled to costs and disbursements, as hereinafter provided."

The foregoing statutory provision fails to provide for an attorney's lien in favor of an attorney who appears on behalf of the state, which attaches to a verdict, report, decision or judgment in favor of the state, or to the proceeds thereof. In other words, the statute makes no reference to the sovereign power, and the sovereign is not included within the foregoing statutory provision either by express words or by necessary implication.

In the case of *Hendrick v. Posey,* 104 Ky. 8, 45 S. W. 525, 46 S. W. 702, it appeared that appellant was attorney general of the state of Kentucky from September 7, 1891, to January 6, 1895, and as such during that time instituted suits against the Kentucky Midland Railway Company and recovered judgments aggregating $11,000; that appellant had said judgments made a prior lien in favor of the state; that the property of the railway company was sold after the expiration of

appellant's term of office; that the master commissioner, under the order of the court, was directed to pay to the commonwealth $7,578.65, its *pro rata* share of said judgment; that appellant, believing that he had a right so to do, received the money from the commissioner as the attorney for the commonwealth, and contended that inasmuch as the auditor and Governor had refused to fix the amount of his compensation according to statute, he had a right to receive and retain the money paid him by appellee, and that he had a special lien thereon by virtue of sec. 107, Ky. Stats. The supreme court of Kentucky did not agree with his contention, but, to the contrary, held that sec. 107, Ky. Stats. (which is similar to sec. 4900, Rev. Codes, as amended, *supra*), had no application to the commonwealth, and cited in support thereof *Commonwealth v. Cook,* 8 Bush (71 Ky.), 220, 8 Am. Rep. 456, where the court held that "The commonwealth is not embraced by an act which is made to operate between individuals unless there is something in the act which shows an intention to subject the state to the same rule. As the government of the state is established for the good of the whole, and can only be supported by means of its revenues, courts in the construction of general laws will not ordinarily apply to the state such as upon their face seem to have been intended only for declaring or regulating the rights and remedies of individuals, and which, if so applied, would have the effect of obstructing the speedy collection of the public dues." (*Divine v. Harvie,* 7 T. B. Mon. (23 Ky.) 439, at 443, 18 Am. Dec. 194.) This rule of law the court in its opinion held to be founded, "Not only upon the highest public policy but as warranted by the firmly established maxim that 'General statutes do not bind the sovereign unless expressly mentioned in them.' Laws are *prima facie* made for the government of the citizen and not of the state herself." (*Compton v. State,* 38 Ark. 601.)

The appellant is seeking to recover an alleged indebtedness due him, or, in other words, to enforce a claim against the state, and it is immaterial that the moneys out of which he seeks to compensate himself have not yet found their way into the state treasury. It is a claim against the state, neverthe-

less. It is quite evident that a debt cannot be recovered against the state under any general statute regulating the recovery of debts, unless the statute by express terms or necessary implication authorizes such a procedure. "It is a settled rule that in general statutes which regulate the recovery of debts the government is not bound unless they are made applicable to it in express terms or by necessary implication." This is no invidious or prerogative right, but a rule founded on well-ascertained public policy, necessary to protect the public interest against the negligence of public officers; and especially to guard the public revenue. It is a rule adopted in many, if not all, of the states, and probably in most other countries, and has been sanctioned by repeated judicial decisions. (*United States v. Wilson,* 8 Wheat. (21 U. S.) 253, 256, 5 L. ed. 610, 611; *United States v. Hoar,* 2 Mason, 311, 314, Fed. Cas. No. 15,373; *United States v. Greene,* 4 Mason, 427, 433, Fed. Cas. No. 15,258; *United States v. Hewes,* Crabbe, 307, 26 Fed. Cas. 297, No. 15,359; *Stoughton v. Baker,* 4 Mass. 522, 528, 3 Am. Dec. 236; *People v. Rossiter,* 4 Cow. (N. Y.) 143; *Commonwealth v. Baldwin,* 1 Watts (Pa.), 54, 26 Am. Dec. 33; *King v. Allen,* 15 East, 340.)

This same principle is announced in the case of *Wood v. State,* 125 Ind. 219, 25 N. E. 190, where the court held that "The law will not permit the administration of governmental affairs to be embarrassed by the seizure of public property or public funds to pay debts due individuals."

The proceeds of the judgment recovered against the National Surety Company is a public fund, which had been embezzled by a public official, and recovered back. It belongs to the state, and it is out of this fund that appellant seeks the payment of the claim which he contends is due him, and insists that his claim became a lien, and enforceable as such, against the moneys of the state, and that he has a right to stop this money *in transitu* and subject it to his lien before it reaches the state treasury; that his right to have a portion of said fund paid to him by order of the court is not limited by the provisions of sec. 4900, Rev. Codes, as amended, *supra,* but that he has an equitable lien, which should be enforced

by the trial court, whose duty it is to protect its officers in the matter of the payment to them of such fees and disbursements as may be found to be due them by the court. With this contention we are not in accord, for the reason that no equitable lien attaches in favor of the appellant where the constitution and statutes in express terms provide an adequate remedy, and where the procedure for pursuing this remedy is expressly provided, it must be followed in order to authorize the payment of any claim against the state.

Sec. 18, art. 4, of the constitution provides that "The Governor, Secretary of State, and Attorney General shall constitute . . . . a Board of Examiners, with power to examine all claims against the State, except salaries and compensation of officers fixed by law. . . . . "

This clause of the constitution is supplemented by the statutes, sec. 146, Rev. Codes, as amended by Sess. Laws 1913, c. 15, p. 58, as follows: "It shall be the duty of the State Board of Examiners to examine all claims against the State, except salaries and compensation of officers fixed by law. . . . . The Board may approve or disapprove any claim or demand against the State, or any item thereof, or may recommend a less amount in payment of the whole, or any item thereof, and a decision of a majority of the members shall stand as the decision of the Board."

The above sections of the constitution and statutes require all claims against the state of an unliquidated character to be submitted to the state board of examiners for approval or rejection.

To adopt a different rule in this case or any case, no matter how just the claim might be, to permit state officers to be harassed and hindered in the recovery of moneys embezzled by public officials by way of attorney's liens for services alleged to have been rendered the state, would be contrary to good public policy and detrimental to the due administration of the affairs of the government.

But even if the position taken by learned counsel were correct, there must be a valid claim. The lien is merely an-

cillary to the claim.  If there is no valid claim there can be no lien.

It is quite evident that the appellant must rely upon a contract of employment, either by the attorney general or the state depository board, or both.  That being true, it becomes necessary to determine to what extent these officials may bind the state for the payment of claims made against it for such services rendered as the appellant seeks to recover for.

Sec. 1827, Rev. Codes, provides: "The State Auditor and Attorney General may employ other counsel than the county attorney and the expenses must be paid out of the State Treasury."   Sec. 13, art. 7, of the constitution provides that: "No money shall be drawn from the Treasury but in pursuance of appropriations made by law."

The latter clause of sec. 1827, *supra,* namely, ". . . . and the expenses must be paid out of the State Treasury," this court held in the case of *Kingsbury v. Anderson,* 5 Ida. 771, 51 Pac. 744, did not make an appropriation for the payment of such services, and in the absence of an appropriation the auditor properly refused to issue a state warrant in payment for legal services of counsel employed by the state auditor under the provisions of sec. 1827, *supra.*

Therefore, if appellant's contract of employment was made with the attorney general, it must have been understood by appellant that it was in pursuance of an appropriation made by law.  It will be recalled that the legislature convened in regular session subsequent to the discovery of the embezzlement of the state funds by Allen, and the presumption is that they made ample provision for the payment of such expenses as would necessarily be incurred in recovering the moneys so embezzled.  The legislature at its biennial session in 1915 made an appropriation for the attorney general's office for that and the ensuing year of $29,200, for the payment of the salary of the attorney general, the salary of assistant attorneys, stenographers and other expenses, and provided in said act, among other things, that "Any indebtedness created or attempted to be created against the State in violation of the provisions of this act, or any indebtedness attempted to be

created against the State in excess of the proper appropriation, whether made by this act or other provisions of law, shall be void." (Sess. Laws 1915, c. 159, sec. 6, p. 350.) It is, therefore, quite evident that the attorney general was without authority to create any indebtedness against the state in excess of the appropriation for his office, and if there was no appropriation out of which the claim of the appellant could be paid, any attempt to create an indebtedness in favor of appellant by the attorney general, if the attorney general did attempt to create any indebtedness against the state in excess of his appropriation, would be absolutely void.

An examination of the statutes with reference to the duties of the state depository board convinces us at once that there is a total absence of statutory or any authority given it, whereby it is authorized to create an indebtedness of the character sought to be enforced by the appellant, and such expenses as they are authorized to incur in connection with the performance of their duties as members of such board, and in carrying out the provisions of the statutes defining their powers and duties, must be audited and allowed as provided by law, by the state board of examiners, and paid out of the general fund of the state.

From what has been said it follows that the attorney general would be without authority to employ appellant, and thereby charge the state with a claim for services rendered in excess of the appropriation made for his office for the years 1915 and 1916; but admitting that the attorney general had authority to employ appellant, under the constitutional and statutory provisions heretofore cited, the claim for services rendered, being one against the state, and not being a fixed salary, would necessarily have to be submitted to the state board of examiners for allowance or rejection.

The presumption is that the state will pay all valid claims properly presented against it, and for that purpose has provided a method whereby all claims against the state may be presented to a constitutional board with exclusive power to examine, audit and allow such claims, in whole or in part, as are found to be legal charges against the state, and as was

announced by this court in the case of *Rathbun v. State*, 15 Ida. 273, 97 Pac. 335, a laborer or materialman may have a claim against the state within the meaning of that term, and yet be entitled to no lien to secure the payment of the same. That is, in our opinion, the position that appellant, as well as all other claimants against the state, occupies, under the constitution and laws of this state. They must present their claims to the properly constituted board for allowance or rejection, or for the procurement of a recommendatory judgment for submission to the legislature.

From what has been said it follows that the trial court did not err in refusing to continue in full force and effect the temporary restraining order issued and heretofore referred to, and requiring the National Surety Company, and its attorneys, to deposit with the clerk of said court the sum of $14,056.93, a portion of the proceeds of the judgment recovered in favor of the state, and to require the state and the National Surety Company to answer the amended complaint in intervention of the appellant. The order of this court, heretofore made, directing that John W. Eagleson, as state treasurer, receive said sum of $14,056.93 from the National Surety Company, and place the same in a special fund, subject to the order of this court, as directed in its order of September 22, 1916, is hereby vacated and the state treasurer directed to place the above-mentioned sum into the proper fund as provided by law.

The judgment of the trial court is affirmed. Costs are awarded to respondent.

Morgan, J., concurs.

SULLIVAN, C. J., Dissenting.—I am unable to concur in the conclusion reached by the majority of the court. The majority opinion proceeds upon the theory, as I understand it, that under certain constitutional provisions and under the laws of this state an attorney who has been engaged to prosecute a claim in favor of the state and obtains judgment for

the state has not an equitable, charging lien against said judgment before it is paid over to the state.

The lien claimed in this case is not claimed under the attorney's lien law of the state, and the main question to be determined is whether the attorney is entitled to the payment of a reasonable attorney's fee for the services rendered in procuring a judgment amounting to nearly $154,000 in favor of the state. The amount of the attorney's fee is not involved in this appeal.

If it were held on this appeal that the attorney's fee and certain costs were payable out of the proceeds of said judgment, the matter would then have to be sent back to the district court to determine the value of the attorney's services.

*In limine,* since the matter involved in this case has been injected largely into the politics of the last campaign, and great injustice done the appellant by reason of misrepresentations made, as has appeared from the public press of the state and otherwise, I shall state the facts involved in considerable detail and the law applicable to those facts.

The main action against the surety company by the state to recover the loss occasioned by the defalcation on Allen's official bond was commenced in November, 1915. It appears from the record that appellant was employed as special counsel for the state in said matter on or about December 15, 1915, by the attorney general, and the state depository board of the state of Idaho. At the time of said employment the compensation of appellant was not fixed, but it was mutually understood that he should be paid the reasonable value of his services. He began his work under such employment about December 17, 1915, and was engaged therein practically without intermission from said date until July 22, 1916. In the course of his employment he worked under the direction of the state depository board, and pursuant to directions received by him from said board, he was permitted to have the assistance of a former deputy state treasurer, who was then confined in the state penitentiary and was very familiar with the books kept by the state treasurer, Allen, since he had kept said books of account and knew where all the

false entries had been made. With such assistance the appellant made a complete examination into the affairs of the state treasurer during the whole of said Allen's term as state treasurer, covering the years of 1911, 1912, 1913 and 1914. Said examinations were made upon the orders of the state depository board for two purposes: First, to ascertain and report whether everything irregular in said office had been discovered and pointed out by certain experts; and, second, to obtain data and information upon which to file an amended complaint in said action. During that time appellant was called upon by said depository board to act in the capacity of special guard of the penitentiary during the entire time that said deputy state treasurer was assisting appellant in said work, and during the entire trial was called upon by said board to act in the capacity of special guard for said ex-treasurer and his said deputy, who were in attendance during the trial. The appellant had entire charge of the preparation of said cause for trial, and the entire charge of said case at said trial. He drew all pleadings of the plaintiff in said cause, including the findings of fact and conclusions of law and decree.

Appellant is a resident of Pocatello, Idaho, and has been a resident there since December 8, 1915, and maintains an office there. Pursuant to his said employment and the wishes of the attorney general and the state depository board, he had been away from his office in Pocatello from December 17, 1915, up to the time of the trial of said cause in July, 1916, with the exception of perhaps two weeks. In the preparation of said cause for trial, certain depositions were taken in Chicago, Illinois, and appellant personally went to Chicago and was present at the taking of said depositions.

While acting as special guard for said Allen and his deputy, who were then confined in the state penitentiary, he incurred certain expenses for meals while they were in the city and certain expenses for taxicab to take them to and from the penitentiary and to and from the court, such expenses amounting in all to $168.85, no part of which has been paid by the state.

The stenographer who reported said case charged over $900 for his services, which has not been paid, and it appears that there are no appropriations available out of which said expenses can be paid, and that unless they can be paid out of the proceeds of said judgment, deficiencies will be created in violation of the provisions of the law (Sess. L. 1915, p. 361). The appellant has no other remedy than the subjecting of said judgment to the payment of his expenses and fees, and if all of the proceeds of said judgment are paid in to the state treasurer, petitioner claims that he will be remediless.

Appellant claims that his services were reasonably worth $12,500, but concedes that he has not the right to fix the value of such services, and states in his complaint in intervention as follows:

"That this affiant concedes that it is not his right to fix the amount of his compensation, and is likewise of the opinion that it is not right and just, under the circumstances, that the State Depository Board should be permitted to fix the same, and this affiant asks nothing more than his day in Court, with an opportunity to have this Honorable Court [The District Court] after full hearing, determine the right of this affiant to compensation out of said judgment, and the fair and reasonable amount of such compensation; and that a portion of the proceeds of said judgment be placed in such shape that should this Honorable Court decide in favor of this affiant the means of enforcing such judgment will not be taken away."

The appellant thus admits that he cannot fix his attorney's fee in said matter, but claims that the reasonable value of his services is $12,500, and all that he asks is to have the question submitted to a court of competent jurisdiction in order to have it determine the value of his services.

It appears from the record that he was regularly employed to perform this service; that he performed it with honor to himself and with great profit to the state. The state accepted his services, and ought it not in common fairness and honesty be willing to pay the reasonable value of such services? But the majority holds that the contract of employment be-

tween the state depository board and the appellant was absolutely void for the reason that no appropriation had been made for the payment of such services. The majority opinion states: "Therefore, if appellant's contract of employment was made with the attorney general, it must have been understood by appellant that it was in pursuance of an appropriation made by law." Why say, "it must have been understood" that such contract of employment was in pursuance of an appropriation made by law when it was known to all concerned that no such appropriation had been made?

Then, for the majority to argue "that it must have been understood," etc., is certainly very remarkable when we take into consideration that for the purposes of this appeal the allegations of the complaint in intervention must be taken as true. The majority opinion, after quoting that part of the Laws of 1915, sec. 6, p. 350, declaring any indebtedness created or attempted to be created in excess of the appropriations made shall be absolutely void, states: "It is, therefore, quite evident that the attorney general was without authority to create any indebtedness against the state in excess of the appropriation for his office, and if there was no appropriation out of which the claim of the appellant could be paid, any attempt to create an indebtedness in favor of appellant by the attorney general, and against the state, would be absolutely void."

It might be inferred from the foregoing quotation from the majority opinion that the attorney general alone made the contract of employment with the appellant, but that idea is not borne out by the first paragraph of the complaint in intervention, which is as follows: "That he was employed as special counsel for the plaintiff in the above-entitled cause on or about the 15th day of December, 1915, by J. H. Peterson, Attorney general of the State of Idaho, and by the State Depository Board of the State of Idaho." The record therefore clearly shows that the appellant was employed to perform the services he did perform by the attorney general and the state depository board.

As I view it, there was no effort made in this matter to create a claim against the state. The attorney general, the depository board and the appellant all well knew that there was no attempt in this matter to create a claim against the state. If the officers so understood it, they are clearly guilty of a crime. They knew that if they did undertake to do that, they were violating the provisions of Sess. L. 1915, p. 361, which declares: "No officer, employee or State Board . . . . shall enter, or attempt or offer to enter into any contract or agreement creating any expense or incurring any liability, moral, legal or otherwise, or at all, in excess of the appropriation made by law for the specific purpose or purposes for which such expenditure is to be made or liability incurred. . . . . Any indebtedness attempted to be created against the state in violation of the provisions of this act, or any indebtedness attempted to be created against the state in excess of the appropriation provided for in any act, shall be void."

Sec. 3 of said act provides that "Any person or persons violating the provisions of this Act shall be deemed guilty of a misdemeanor, and shall be disqualified from holding any State office," etc.

The parties to this contract certainly knew of those provisions, and they all knew that the only way that the costs and expense and attorneys' fees in this action could be legally paid would be out of the judgment recovered against the surety company. It seems to me to be most unreasonable to contend in this matter that the compensation of the appellant in procuring said judgment is a claim against the state that necessarily must be presented to the board of examiners and could not be paid until an appropriation had been made therefor, unless that was the contract between the parties, and a contract was distinctly made that the compensation should not be paid out of the proceeds of the judgment obtained.

That section of the Laws of 1915 above quoted clearly contemplates and refers to matters or purposes for which an appropriation has been made, since it is declared that "No

officer . . . . shall enter, or attempt or offer to enter into
any contract or agreement creating any expense or incurring
any liability, moral, legal or otherwise, or at all, in excess
of the appropriation made by law for the specific purpose or
purposes for which such expenditure is to be made, or liabil-
ity incurred." That section of the statute clearly does not
apply to a case like the instant case, for no specific appro-
priation was ever made for the employment of counsel in the
instant case.

In a similar case, that of *Kirby v. State,* 68 Misc. Rep. 626,
125 N. Y. Supp. 742, the court in considering a statute like
the one above quoted said, "That it was not the intention
of the legislature that the provisions of the finance law quoted
should be applicable to such a case as the one at bar."

I shall not presume that it was the intention of the deposi-
tory board to violate that statute and thus become liable to
be deprived of their offices. The reasonable presumption is
that there being no specific appropriation for the payment of
counsel fees and expenses in prosecuting the instant case, the
board contemplated that the attorney's fees and costs must
be paid out of the judgment rendered. Under the statute,
as it now stands, the claims against the state must be filed
with the state auditor, and before they are presented to the
board of examiners for allowance, the state auditor must cer-
tify as follows: "I certify that the above account has been
audited and found correct; that there is authority of law
for its payment; that there is sufficient money in the proper
fund for its payment, and that proper receipts for each item
charged accompany the account." If the act of the legisla-
ture requiring such a certificate from the auditor before any
claim may be presented to the board of examiners is a valid
act, it would be impossible to have any claim passed upon by
the board except those for the payment of which appropria-
tions had been made.

Is it reasonable to presume that the depository board in
the employment of the appellant to prosecute said case in-
tended that he should never receive anything for his ser-
vices, or that he should not be reimbursed for the necessary

cash he paid out in the preparation of the case for trial? I think not; and I do not believe that it was the intent that he should prosecute said case at his own cost and expense and the state go scot-free from paying for his services and the necessary expense for court stenographers and other legal costs involved in the case.

The depository board employed two attorneys to resist this claim of the appellant in the district court, and the record shows that those two attorneys were paid out of the proceeds of this very judgment that the board now claims is too sacred to be touched in any manner for the payment of legal costs or for the value of the attorney's services in procuring said judgment. Said attorneys urged upon this court the proposition that the intervenor must present his claim to the board of examiners, when, as a matter of fact, they were paid their attorneys' fees for urging that proposition out of this very judgment and without having presented their claims to the board of examiners. It has been said that consistency is a jewel.

When a reasonable view of this case is taken, under the law, as it stands, when it is considered that no appropriation was ever made for attorneys' fees or the cost of the prosecution of this case, for the reason that the legislature did not foresee that it would be necessary to go to such an expense, no reason appears why the state authorities should not protect the interests of the state, even though it required a part of the judgment recovered in favor of the state to pay the costs and expense of such prosecution, and this could be done without creating any claim against the state that would require an appropriation to be made to pay it.

Everyone knows, every lawyer knows, and the state authorities know the persistency with which surety companies contest their liability upon any of the bonds given by them, and the necessity of having a lawyer to prosecute such case who is able to cope with the best lawyers in the land, such as surety companies usually employ, and the danger of loss to the state unless such cases are thoroughly tried,—these and many other things conclusively show the wisdom of the

depository board in employing counsel who could properly protect the interests of the state. The further fact that the depository board knew that it had no authority to enter into any contract or agreement creating an expense or incurring any liability in excess of the appropriation made by law for any specific purpose, is convincing to me that they did not intend to violate the law but did intend that the attorney's fee, as well as the other legal costs of this prosecution, should be paid out of the judgment and thus create no claim against the state.

It is true no money can be drawn out of the treasury of the state without an appropriation, but the money represented by this judgment never was in the treasury of the state, and there is the distinction. The majority opinion holds that it is a part of the revenue of the state, when in fact it clearly could not become a part of the revenue of the state in the state treasury, until it had been paid into the state treasury, and it has never been in the state treasury. The state brought this action in the district court against the surety company. It recovered a judgment, and about $14,000 of that judgment is still in the hands of the court and has never been in the possession of the state.

Sec. 13, art. 7, of our constitution, is as follows: "No money shall be drawn from the treasury but in pursuance of appropriations made by law." The money represented by the judgment in question never has been in the treasury, and that section has no application whatever to the payment of attorney's fees and the legal costs of the prosecution of this case. The district court has full authority to require attorneys' fees and all legal costs to be paid out of said judgment before the balance is turned in to the treasury of the state. The money stolen from the state by the ex-treasurer and his deputy was taken from the state treasury, but the money represented by this judgment was never in the state treasury until a portion of it was paid there under the direction of the court. The balance of about $14,000 never has been in the state treasury. It is now held in the hands of the court. It never has become a part of the revenue of the state

held by the treasury of the state; hence it is clear that said section of the constitution above quoted has no application whatever to said fund now in the hands of the court.

I will now proceed to cite authorities which, as I view it, fully sustain the position above taken.

The doctrine is well established that an attorney's general or retaining lien is a common-law lien which has its origin in the inherent power of courts over the relation between attorneys and clients. The courts have the power to enforce the performance by the attorney of his duties toward his client, and this power enables the court to protect the rights of an attorney against his client. This lien is one which the courts have long recognized and protected. (See *Everett v. Alpha Portland Cement Co.*, 225 Fed. 931, 141 C. C. A. 55; *In re Wilson*, 12 Fed. 235.)

The equitable charging lien, which is the one involved in this case, is entirely different from the common-law lien, and it will be noted from the authorities that all characteristics of a charging lien are in their inherent nature equitable. As long ago as 1795, Lord Kenyon, Chief Justice, said that "The principle . . . . was settled long ago, namely, that the party should not run away with the fruits of the cause without satisfying the legal demands of his attorney, by whose industry, and in many instances, at whose expense, those fruits were obtained." (*Read v. Dupper*, 6 Term Rep. 361, 101 Full Reprint, 595.)

The case of *Louisville etc. Co. v. Wilson*, 138 U. S. 501, 11 Sup. Ct. 405, 34 L. ed. 1023, quotes with approval the following from the supreme court of West Virginia (*Renick v. Ludington*, 16 W. Va. 378, 392):

"The lien (even in cases of *quantum meruit*) is in the nature of an equitable lien (*Van Leer v. Van Leer*, 3 Cooper's Tenn. Ch. 23), and is based on the natural equity that the plaintiff ought not to be allowed to appropriate the whole of the judgment in his favor without paying thereout for the services of his attorney in obtaining such judgment."

If the proceeds of the judgment in this case had been paid over to the state, a different case would be presented, but

since the fund, on which the lien is claimed, is still in the hands of the court, and never has been in the treasury of the state and never has been a part of the state's revenue, it ought not to be permitted to be withdrawn from the court without first paying the appellant a reasonable compensation as attorney's fee.

The question now presented is whether or not the principles which establish the right of an attorney to a lien upon the proceeds of a judgment in favor of his client for his necessary and proper expenses, and for his fees, apply where the client is the sovereign state.

At the time the legislature was in session in 1915, the only claim which it was known that the state of Idaho had against the former state treasurer and his sureties was a claim of $93,000, being the actual shortage in cash in the treasurer's office that had been taken from the state treasury, and the legislature, if they considered the matter at all, which it is not at all likely they did, no doubt concluded that it was a very simple matter to establish the state's case against the surety company, but the state depository board and the executive officers having this matter in charge, after the adjournment of the legislature made certain investigations which led them to believe that the claim of the state against the surety company was greatly in excess of said sum, and considered it highly essential that the state's interests should be placed in the hands of counsel skilled in mathematics and possessing some knowledge of bookkeeping. They certainly knew that proper preparation was essential to ultimate success against the surety company, and that the case could not be prepared for trial and the evidence collected without incurring some expense. They also knew that legal counsel could not be obtained without some provision being made for his compensation, since the legislature had made no provision therefor by appropriation. Thus an emergency was placed before the state officials. The rights of the state were here involved, which not having been foreseen by the legislature, was left unprovided for, and it was the bounden duty of the officers of the state to use their best judgment in

obtaining for the state whatever it was entitled to recover from the surety company, and to do this certain expense must be incurred, including counsel fees. That existing appropriations were insufficient to meet the state's expenses in obtaining the large benefits which ultimately accrued from this litigation, is clearly evidenced by the fact that necessary expenses were incurred amounting to $1,556.93 in excess of those appropriations, and counsel fees for which no appropriation whatever had been made.

The results of the litigation fully justified the state officers in the course pursued. At the very outset the state officers were confronted with the fact that there was an absence of an appropriation out of which to pay counsel or to pay the expenses of the trial. And is it more than fair to assume that no attorney would have been willing to take such a case if there were no means by which he could be paid? That no attorney would be willing to pay out of his own money for the necessary expenses of his client unless he relied upon some contract by which he could be reimbursed for his disbursements?

The state officers and the appellant, it must be presumed, knew that all the indebtedness incurred in excess of existing appropriations was void and that he could have no claim against the state for his fees or expenses, unless there were appropriations available out of which they could be paid. He therefore did not rely upon a claim against the state, within the ordinary meaning or acceptation of that phrase. It is apparent that the officers of the state and the counsel employed realized that the compensation for services and reimbursements for expenses must be made a charge upon the fund recovered or they could not be paid at all.

Had no judgment been recovered in this case, counsel could not have recovered a single dollar, and under the decision of the majority, he is now unable to recover one cent of the money expended by him in procuring witnesses and in preparing said case for trial, to say nothing of his fees.

Appellant was employed and actually tried the case, and for his compensation no funds are available other than the proceeds of this judgment.

It will not be presumed that the officers of the state intended to put up a "job" on appellant and procure the great legal services he performed, and then beat him out of his compensation by claiming that their contract of employment was void.

A very similar case was presented to the attorney general of New York where an action was instituted to test the constitutionality of what was known as the "eighty cent gas law," and it was most vital to the interests of the state that the law should be upheld. The attorney general was confronted with the necessity of employing counsel with technical knowledge, the absence of any appropriation out of which his fees could be paid, and the following positive statutory enactment:

"A state officer, employee, board, department or commission shall not contract indebtedness on behalf of the State, nor assume to bind the State, in an amount in excess of money appropriated or otherwise available."

The attorney general employed counsel in the case of *Kirby v. State*, 68 Misc. Rep. 626, 125 N. Y. Supp. 742, and the court, in the face of such a situation, made use of the following language:

"A legislature, in making appropriations for a current year for the attorney general's office, could not foresee the exact amount required for all unanticipated emergencies and contingencies and provide specifically for the payment of each of them. It appropriated an amount for the contingent expenses of the office, and left the attorney general clothed with the authority of the executive law to safeguard the interest of the state according to the necessities of each case as it arose. The attorney general, being charged with a positive duty of defending actions brought against the state, could not justify a refusal to perform such duty on the ground that the legislature had made no appropriation to meet an emergency which it could not foresee. If such were the case, the

state might suffer great loss and the attorney general would be derelict and culpable. Neither could the legislature properly provide for the defense of an action not brought while it was in session, requiring the employment of special and technical counsel. . . . . The claimant, under such agreement, rendered valuable services to the state, protected its interest, and the litigation ultimately resulted in the establishment of the validity of the law. The laborer is worthy of his hire; and the state, having accepted and received the benefit of the claimant's skill and services, should in fairness and equity pay their just worth.''

The opinion in the above-quoted case is very instructive and peculiarly applicable to the facts of this case. The depository board accepted for the state the benefit of appellant's skill and services in the trial of the instant case, and it should in all fairness and equity pay the just worth or value of such services.

It appears from the record that the state officers who have charge of this matter have offered to pay appellant an attorney's fee of $750, which is $157 less than the amount charged by the special court reporter in the case. It is alleged in the complaint in intervention, and so far as this proceeding is concerned is admitted as true, that said alleged offer to pay appellant $750 was not made by the depository board upon an impartial effort to set a fair and reasonable value upon appellant's services, but it was the result of wilful failure to exercise an honest judgment, and was made for the express purpose of depriving appellant of a fair and reasonable compensation for the services rendered, thus presenting an issue of law and fact to be determined by the court.

As significant of the views taken by the depository board in other similar matters, the failure of the Bank of Nampa might be cited, since that matter has become a part of the history of the state. An unusual situation arose in that matter. The personal sureties on the depository bond of the bank turned over to the state a number of mortgages, real and chattel, and considerable personal property. To realize the greatest returns from these securities, it was necessary to

take possession of and administer the property, which consisted of livestock, crops, etc. No state official could perform those duties. No office was created and no appropriation existed designed by law to meet such a situation. Must the state lose the benefit of these securities, or were the executive powers of the sovereignty sufficient to meet those conditions? The attorney general very properly ruled that the state depository board could employ such labor and assistance as were necessary and could pay all necessary compensation and expenses incurred in the administration and liquidation of these securities out of the funds thus created. The ruling of the attorney general was evidently correct, and is supported by ample authority. The soundness of the attorney general's opinion in that matter is based upon the evident economic principle that the sole lawful interest of the state in that property was only the net profits after all proper expenses of administration and liquidation had been paid out of the property itself. In the absence of statutory command as to the methods to be employed, the executive branch of the government not only may, but in the discharge of its duty must, employ such practical business methods as will produce the best results for the state.

The view taken of that matter by the executive department was the only reasonable view to be taken, but suppose that department had concluded that there was no appropriation to pay the expense of administering on the state of the defunct bank and thus occasion great loss to the state, the officers would certainly be held to be derelict in their duty. And so in the case at bar; if they neglected to perform their duty and prosecute this case with reasonable diligence, they would have violated their official duty.

I will now proceed to investigate the legal principles involved in applying to the state the general rule as to attorney's equitable liens.

Can a lien exist as a matter of right upon the property of the sovereign, and if so, under what circumstances is the remedy available for its enforcement?

In the case of *Briggs v. A Light Boat,* 89 Mass. (7 Allen) 287, and 93 Mass. (11 Allen) 157, it was held that a lien did exist against the United States under the facts of that particular case, and that a remedy for its enforcement was available. Three light boats had been built for the United States by a contractor. Upon completion they were paid for, and the United States had actual possession of them. Briggs and another claimed and perfected a statutory materialman's lien upon the boats for lumber furnished to the contractor to be used in their construction. They then petitioned for the enforcement of the lien and the trial court held that no lien could exist against public property in the possession of the United States and used by them as an instrumentality of government. From that judgment the petitioners appealed and obtained a reversal. The supreme court held (7 Allen, 287) that the lien had attached under the statute while the boats were in the possession of the contractor, and that the United States was a purchaser from him, taking the property subject to the lien. The court said:

"The truth is, that when the government becomes the purchaser of property, it takes the title subject to the same rules as those which regulate the transfer of it to private persons. If it is subject to liens or encumbrances, it passes *cum onere.* So it is held in cases of ordinary maritime liens. If the government becomes the owner of the vessel by purchase, forfeiture or otherwise, it takes a title subject to the same liens for salvage, wages, bottomry and other claims as would attach to it if sold to private persons."

The matter was then referred to the assessor and auditor, upon whose reports judgment was entered for the amount found due the petitioners. The United States then appealed, and in the decision (11 Allen, 157) the court said:

"The question which has now been argued is not of the petitioners' title, but of the mode of asserting it; not of right, but of remedy. The United States do not now deny that they took their title subject to the lien of petitioners. That point was determined by this court, after full consideration, upon the former argument of one of these cases. . . . .

"At that argument the attention of counsel was chiefly, and of the court exclusively, directed to the question of title; it was assumed by the court that the lien carried with it the right to maintain this process; the effect of the possession of the United States upon the possibility of enforcing the lien in this form of proceeding, although involved in the ruling which the superior court had made at the trial, was not considered."

It is there held that it is an elementary principle of English and American constitutional law that no direct suit can be brought against the sovereign without its consent, and the court among other things said:

"Nor is this case like one in which the government has, by bringing a civil action to enforce its own rights to property in the possession of an individual, submitted itself to the jurisdiction of the court, and, being itself the actor, needs the assistance of the court to recover its property.

"The United States have never, by general statute or special order, submitted themselves or their rights in this matter to the jurisdiction of the state courts. But, on the contrary, as soon as notified of these petitions, and before answering on the merits, they filed a special appearance, and a plea distinctly setting forth the grounds on which they claimed exemption from the state process."

The exemption of the state from suit in its own courts was held to apply also to the United States in the state courts, and after referring to the fact that the property subjected to this lien had been delivered to the United States by the contractor and the price paid by them to him, the court said: "The petitioners suffered the title to pass, and the possession to be delivered, to the United States, before they took one step in the state courts to establish their lien." (11 Allen, 164.)

The distinction between that case and one like the case at bar, where the proceedings were instituted before the property came into the possession of the sovereign, is then stated as follows:

"If they had filed their petitions and attached the vessels before these came into the possession of the United States, they might well have contended that the courts of the commonwealth had acquired a jurisdiction of the cases, which could not be divested until the object of the suits was accomplished."

In the case of *United States v. Wilder,* 3 Sumn. 308, 28 Fed. Cas. No. 16,694, a lien asserted against goods of the United States was upheld and enforced. Mr. Justice Story delivered the opinion in that case, and it was argued on behalf of the government that it is a prerogative of sovereignty that no lien can exist against the sovereign. The court said:

"The argument rests the objection upon the ground of public inconvenience, if it should be held that whenever a lien exists against a private person, it is to be held that the like lien attaches against the United States."

It was pointed out in that case that the law enforces a contribution in such a case upon the ground of justice and equity. The court said: "And it gives a lien *in rem* for the contribution, not as the only remedy, but as, in many cases, the best remedy, and in some cases the only remedy. . . . . It is said that, in cases where the United States are a party, no remedy by suit lies against them for the contribution; and hence the conclusion is deduced that there can be no remedy *in rem.* Now, I confess that I should reason altogether from the same premises to the opposite conclusion. . . . . I cannot therefore but think, that the circumstance that the United States can in no other way be compelled to make a just contribution of its share in the general average, so far from constituting a ground to displace the lien, created by the maritime law, does in fact furnish a strong reason for enforcing it. For I know no reason why this court should create by its own mere authority an exemption, nowhere found recognized in the maritime law, and standing upon no very clear or urgent ground of public policy. . . . . The argument, therefore, addressed to this court, on behalf of the government, *ab inconvenienti,* does not seem to have any very solid foundation. On the other hand, the argument

*ab inconvenienti* on the other side is very cogent and persuasive; for it is beyond doubt that if there be no lien, there is no remedy to enforce an incontrovertible right.''

Mr. Justice Story then quotes from Vattel as follows:

''If there exists any difficulty on this account, it is equally conformable to prudence, to the delicacy of sentiment, which ought to be particularly conspicuous in a sovereign, and to the love of justice, to cause them to be decided by the tribunals of the state. This is the practice of the states that are civilized and governed by laws.''

This state ought to be governed by laws, rather than by the mere caprice and whim of any board.

In *The Siren* case, 7 Wall. (74 U. S.) 152, 19 L. ed. 129, the steamer ''Siren'' was captured by the U. S. navy in February, 1865. A prize crew was placed in charge and she was ordered to Boston for adjudication. On her way she stopped at New York and proceeding thence ran into and sunk the sloop ''Harper.'' On her arrival in Boston, a libel in prize was filed against her by the United States, and she was condemned and sold. The proceeds of the sale were deposited with the assistant treasurer of the United States, subject to the order of the court. In rendering the decision of the court Mr. Justice Field cites several authorities, and after reviewing the Light Boats cases, says:

''A claim or lien existing and continuing will be enforced by the courts whenever the property upon which it lies becomes subject to their jurisdiction and control. Then the rights and interests of all parties will be respected and maintained. . . . . So, if the property belonging to the government, upon which claims exist, is sold upon judicial decree, and the proceeds are paid in to the registry, the court would have jurisdiction to direct the claims to be satisfied out of them.''

Upon these principles the case was remanded, ''with directions to assess the damages and pay them out of the proceeds of the vessel before distribution to the captors.''

The question as to whether a lien can be enforced in such cases was well considered by the courts in the Light Boats

cases, and in those cases, after a full review of authorities, it was held that such a lien cannot be enforced where, in order to do this successfully, it is necessary to bring suit against the United States. It is also held that no suit *in rem* can be maintained against the property of the United States when it would be necessary to take such property out of the possession of the government by writ or process of the courts. It is a well-established doctrine that proceedings *in rem* to enforce a lien against the property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under processes of the court. The doctrine is well established that when the government itself seeks its rights at the hands of the court, equity requires that the rights of other parties interested in the subject matter shall be protected.

In *Cunningham v. Macon etc. R. R. Co.*, 109 U. S. 446, 3 Sup. Ct. 292, 609, 27 L. ed. 992, it was said:

"It has been held in a class of cases where property of the state, or property in which the state has an interest, comes before the court and under its control, in the regular course of judicial administration, without being forcibly taken from the possession of the government, the court will proceed to discharge its duty in regard to that property. And the state, if it chooses to come in as plaintiff, as in prize cases, or to intervene in other cases when she may have a lien or claim on the property, will be permitted to do so, but subject to the rule that her rights will receive the same consideration as any other party interested in the matter, and be subjected in a like manner to the judgment of the court. Of this class are the cases of *The Siren*, 7 Wall. (74 U. S.) 152, 157, 19 L. ed. 129, 132; *The Davis*, 10 Wall. (77 U. S.) 15, 20, 19 L. ed. 875, 877, . . . . and others."

In the *United States v. Wickersham*, 10 Fed. 505, it was held that it may be assumed that the United States, whenever it comes into court and brings its suit against a citizen, consents to submit to and carry out whatever decrees may be lawfully made against it in the course of the legal procedure.

The principle upon which those cases rest applies to an

attorney's lien. And it was so held in the case of *State of Texas v. White* (*In re Paschal*), 10 Wall. (77 U. S.) 483, 19 L. ed. 992. In that case Mr. Paschal had been retained as special counsel for the state of Texas and had conducted to a successful conclusion a great deal of litigation in regard to certain indemnity bonds.

Out of moneys collected by Paschal, upon judgments which he had obtained for the state, he retained $47,325 to cover his counsel fees and disbursements. The state appeared by other counsel and moved the court to strike Paschal's name from the docket as its attorney, and to order him to deposit the $47,325 in court for its benefit. The defense of Paschal was that he had an attorney's lien upon this money, and that he held it under his lien for compensation and expenses. The argument of the state was that the United States supreme court was without jurisdiction to pass upon a claim set up by a citizen against the state of Texas; that it is a presumption of law that a sovereign power will do justice, and that those who contract with the state must rely on the discretion and good faith of the legislative body. The court in that case briefly reviews the authorities dealing with attorneys' liens as between private parties, which it says are "decidedly in favor of his lien," and then says:

"As the original retainer was made in Texas, we are inclined to the opinion that the rights of the parties are to be regulated by the laws of that state. But if this be not the case, this court would be guided by what it deems to be the prevailing rule of this country; and, according to this rule, we are of the opinion that the respondent has a lien on the fund in his hands for the disbursements and professional fees in relation to the indemnity bonds."

Here we have a direct decision that an attorney's lien was a valid and subsisting right even against the state. This case is practically on all-fours with the instant case, since the funds are still in the hands of the court who rendered the judgment in favor of the state, and have not been turned over to the state. The court has jurisdiction of such funds

to pay all proper costs and expenses incurred in such litigation.

In the case of *State v. Ampt,* 6 Ohio Dec. 699, 7 Am. Law Rec. 469, 5 Cent. Dig., "Attorney and Client," Column 1974, the court held that "the attorney has a lien on the money of the state which comes into his hands as the fruit of his services, for his compensation and necessary expenses, the same as though his client were an individual, and he can apply the same in payment of such compensation and expenses."

Upon the principles laid down in the foregoing cases it is clear that a sovereign, as well as an individual, can obtain the services of an attorney under such circumstances as will give to the attorney the right to assert a lien for his disbursements and fees against funds in the hands of the court obtained upon a judgment in favor of the state.

The above cases, or the most of them, were discussed and applied by the supreme court of Minnesota in a case wherein the conclusion reached is precisely that contended for by the appellant. They were held to establish the right of an attorney as against his client, the sovereign, to assert and enforce a lien for his fees and expenditures under a contract of employment similar to that in the case at bar. (*Board of Commrs. v. Clapp,* 83 Minn. 512, 86 N. W. 775.)    In that case it was held that the only part of the recovery which could be legally termed "public funds" was the amount remaining after the expenses of litigation were paid. So in the case at bar, the amount of this judgment belonging to the state as a part of its public funds would only be what remained after paying the entire cost of the litigation, including attorneys' fees. In the Clapp case the court said:

"There is no sound distinction to be drawn between money expended in such proceedings in the way of disbursements and in the way of attorneys' fees. . . . . It must be noted that the doctrine is founded upon the fact that such fund is created by the exertions of the attorney, and grows out of his contract relation with reference thereto, and has application only to such a condition. The statute (section 687, *supra*) does not prohibit such application as was made in this in-

stance by respondents. If they had not retained their fees, but had not paid over to the county the entire amount collected, then the method of collecting their claim against the county would be regulated by the section cited.''

This case is directly in point, as I view it.

In the case of *Union Pacific R. Co. v. United States,* 2 Wyo. 170, goods belonging to the United States were shipped under the usual bill of lading contract over the lines of the railroad company from Omaha to Rawlins, Wyoming. The goods were stored and held by the railroad company under claim of a common carrier's lien for freight charges. Without paying the charges, the federal government brought this action in replevin to recover the goods. The court held that had the ownership of this property been in a private citizen, ''the company would have had the usual common carrier's lien upon it for these charges.'' The only question presented was whether the same lien was good upon the property of the United States. The court first considered the case upon the theory that government property is exempt from a common carrier's lien, and that the government can retain or waive this exemption. As to that theory it was held that in that particular case, if the exemption did exist, it had been waived. The court, however, goes directly to the real merits of the situation in a very able investigation as to whether such exemptions do exist, and said:

''But the exemption does not exist. The exemption would incalculably cripple the public service, the liability would equally promote it; no consideration of justice or policy favors, every consideration of justice and policy forbids, the exemption; the liability enlarges, the exemption narrows, sovereign action; the liability, not the exemption, is a privilege, and therefore an attribute of sovereignty. The learned counsel for the defense in error has submitted to us no adjudication to the contrary, which we should follow as a guide, or respect as advisory; and we are convinced that such adjudication does not exist. On the other hand, all the analogies of the commercial and maritime law, and the federal decisions under that law, are directly the other way. In 9 Wheat. (22 U. S.)

409, 6 L. ed. 122, St. Jago de Cuba, it was decided in 1824 that seamen and materialmen, who served and supplied the ship after her seizure as a slaver, had respectively liens upon her against the United States for wages and supplies, and that she stood pledged to them accordingly.''

This is a very instructive case, and we quote further from it:

''The counsel for the government claims that the district court could render judgment for but not against it; we have listened with attention and respect to his argument, advanced in favor of this proposition; and candor requires us to admit that he has presented it as well as it could be presented; but candor also compels us to say that the proposition is throughout and throughout a fallacy. To what consequences does the proposition lead? The United States may invoke the jurisdiction of the court; it may accept that which does, and discard that which does not, accord with its supposed interests; it may dictate the exercise of the administration of the law; it is not bound by the rules of equal justice; it is a privileged suitor; the district court having rendered a judgment against it, this court must reverse; having rendered one for it, this court can only affirm; it can sit in appeal, must mechanically obey, cannot revise; nay, further,—having brought the suit, and effected a caption, its aim is accomplished; it needs no judgment, for but one judgment can be rendered in the case, and that in its favor; if, having made the caption, it neglects to prosecute the writ, a motion to dismiss for want of prosecution will be unavailing; still further, the demand in the writ for judgment is meaningless, the undertaking of the sureties without force, the writ is superfluous; and the suit is farcical, because it is intended to effectuate under the forms of law what can as well be accomplished by the violent hand under an irresponsible will. Does not the proposition result in a pure *reductio ad absurdum?*''

It was there held that a suit cannot be instituted against the property of the government, if the bringing or the institution of the suit requires the issuance of process against the government, or the disturbance of its possession of its property;

that the exemption is personal, and the will to retain is a will to waive it in the exercise of sovereign interests. When it does waive the privilege invoking the jurisdiction of the court it submits to that jurisdiction, presenting a claim for adjudication. It asks that the claim be adjudicated on its merits, and allowed or rejected accordingly. In closing the court said: "Were we to send the case to the district court, we should direct it to embrace in its judgment the attorney fees, fixed at a reasonable amount upon the principle above stated."

The railroad company, however, waived the fees and judgment was entered in the supreme court for the transportation charges and costs. (See, also, *United States v. Boyd,* 79 Fed. 858.)

It must be borne in mind that the fund sought to be charged with the attorney's fee and expenses in this case has never been in the possession of the state, and, in my view of the matter, under the facts and law of this case, there is ample authority for holding that the appellant is entitled to the payment of his legal expenses and attorney's fees out of the fund now in the hands of the court.

It has been contended by counsel for the state that this is a claim against the state, and that the constitution and statutes provide an exclusive procedure for obtaining payment. There is nothing in this contention. If the appellant were seeking to have a claim presented to the state board of examiners and to have it paid out of the treasury, then there might be something in that contention; but such is not the case. Appellant is seeking to subject to the payment of his fees a fund that has never been in the state treasury, and the state's possession of the fund could not be disturbed by such payment.

In this case no process has ever been issued against the state of Idaho or any of its officers, no possession of the state has ever been or can be disturbed. No personal judgment can be given against the state upon which execution can be levied upon any state property. This is a proceeding *in rem* against the property not in possession of the state, but in the hands of the court, and any decree that may be rendered will be

satisfied out of the property now in the hands of the court. The state was not brought into court by any process. It came in voluntarily, by itself, as plaintiff seeking the assistance of the court for the recovery of a judgment against the surety company. By so doing it submitted to the jurisdiction of the court, and cannot in one breath ask the court for its assistance in recovering a judgment against a surety company, and in the next breath deny to the court the right to protect its officers in that proceeding and to administer justice fairly and honestly in that case.

The state has accepted the services of appellant. The record shows that he served the state faithfully and well, and no sufficient reason is shown why the state should attempt to evade its liability to pay for his services. Can any good reason be offered why the state in this matter should be unaffected by considerations of morality and right which ordinarily bind the conscience? The observance of honesty and fair dealing on the part of the state becomes of higher importance—of higher importance to the state—than the money involved in this case. It was said in *Woodruff v. Trapnall*, 10 How. (51 U. S.) 190, 13 L. ed. 383, that "we naturally look to the action of a sovereign state, to be characterized by a more scrupulous regard to justice, and a higher morality, than belong to the ordinary transactions of individuals." Is there any justice or morality in the state's attempting to avoid the payment of just compensation for services that it contracted for and received, and which services were of great value to the state? It seems to me that under the pleadings in this case the honor and good faith of the state is put to the test, and no hair-splitting statutory constructions should be made by the state to avoid the payment of an obligation where it has received the services.

Sec. 10, art. 5, and sec. 18, art. 4, of our constitution, provide a process by which a claimant seeking to enforce a claim against the state may overcome two obstacles which in the absence of those provisions would make it impossible for him to obtain any remedy whatever. The first is to divert the possession of its personal property or money; the second, to

bring the sovereign within the jurisdiction of the court. If neither of these obstacles are presented to a claimant seeking to enforce payment against the state, how can it be reasonably said that he must nevertheless pursue methods or a procedure that has no application whatever? The board of examiners may hear claims against the state in order that they may be paid out of the money in the possession of the state, or in its treasury. They cannot order such claims paid out of money that never was in the possession of the state treasury, and unless the claim presented to such board is to be paid out of the treasury, the board has no jurisdiction whatever, either under the constitution or the law, to pass upon it. The board has jurisdiction of the money in the possession of the state in so far as the payment of claims against the state out of such money is concerned, but it has no jurisdiction whatever to pass upon any claim which has to be paid out of funds which are within the exclusive jurisdiction and control of the court and never has been in the state treasury.

The main question before the court is as to whether the attorney's fees and costs of the litigation in this case may be paid out of the judgment obtained, and it is clear to me that they ought to be so paid and that the case should be remanded to the district court to determine a reasonable fee to be paid to the appellant.